IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| TRAVIS RYAN YOUNG, | § | Case No. 17-30163-hcm |
| | § | |
| Debtor. | § | |
| | § | |

**PAMELA YOUNG'S *THIRD* MOTION TO COMPEL AND FOR
SANCTIONS AGAINST DEBTOR TRAVIS RYAN YOUNG**

TO THE HONORABLE H. CHRISTOPHER MOTT, U.S. BANKRUPTCY JUDGE:

COMES NOW, PAMELA YOUNG, a creditor and party in interest herein, by and through her attorneys, James & Haugland, P.C., and files this, her *Third* Motion to Compel and for Sanctions Against Debtor Travis Ryan Young, and in support thereof would respectfully show the Court the following:

## I. JURISDICTION

1.  The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334 and 11 U.S.C. §§ 105 and 727. This contested matter is a core proceeding arising under title 11 pursuant to 28 U.S.C. § 157(b)(2)(A), (I), (J) and (O).

## II. FACTS

2.  On February 3, 2017, Travis Ryan Young (hereinafter "Debtor") filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code [Bankr. Doc. # 1].

3.  After consulting with counsel for the Debtor and the Debtor in order to schedule a

2004 Examination, counsel for Pamela Young sent a Notice of Intent to Conduct Rule 2004 Examination Duces Tecum of Debtor, Travis Ryan Young (hereinafter the "2004 Exam Notice") to the Debtor and his counsel on March 6, 2017, scheduling a document production on March 27, 2017 and a deposition examination of the Debtor for March 28, 2017.

4.    Travis Ryan Young retained Michael Nevarez to represent him with regard to the Rule 2004 Examination. Mr. Nevarez contacted the undersigned and requested a postponement of the 2004 Examination until the week of April 3-7, 2017.

5.    On April 3, 2017, the Debtor appeared with counsel and produced some of the documents responsive to the 2004 Exam Notice; but, the Debtor also failed to produce documents in many of the categories requested and adamantly refused to produce any documents related to his wife, Brittany Young or to her allegedly separate business entities.

6.    In his April 4, 2017, 2004 Examination, the Debtor testified that he has been engaged in the home building business since approximately 2008.[1] See Exhibit P-1 at 7:6-12. The Debtor also testified that Brittany Young is his wife. See Exhibit P-1 at 18:5-6. Debtor further testified that he entered into a written marital agreement with Brittany Young approximately two years ago in which they agreed that their bank accounts and

_____

[1]A true and correct copy of the transcript of the April 4, 2017 Oral Deposition of Travis Young (a Rule 2004 Examination) is attached hereto as Exhibit P-1 and incorporated herein by reference.

income would be separate property.  See Exhibit P-1 at 24:11-25:17.  Debtor stated that he did not produce any bank account statements for Brittany Young at the 2004 Examination because they are her separate property.  See Exhibit P-1 at 23:25-24:10; 49:8-12.

7.   On May 5, 2017, Pamela Young filed her *first* Motion to Compel and for Sanctions Pursuant to Rule 2004 [Bankr. Doc. # 12] seeking to compel the Debtor to produce documents which he had failed to produce at the Rule 2004 Examination.  On that same date, as a result of Debtor's failure to produce the requested documents, Pamela Young filed an adversary proceeding against Debtor objecting to discharge under 11 U.S.C. § 727(a)(2)(A), (a)(3) and (a)(5). [Adv. 17-03009 Doc. # 1].

8.   On June 15, 2017, this Court entered an Agreed Order Resolving Motion to Compel and for Sanctions Pursuant to Rule 2004 (hereinafter the "Agreed Order") [Bankr. Doc. # 32] in which the Court granted Pamela Young's Motion to Compel and for Sanctions in part and denied it in part.[2]  Specifically, in paragraph 5 of the Agreed Order the Court ordered the Debtor to produce the following documents and/or information (signified according to the paragraphs contained in the 2004 Exam Notice) within fourteen (14) days from the date that the Agreed Order is filed:

(b)1)   The July, 2016 through January, 2017 bank statements and checks for the

---

[2]For the Court's convenience, a true and correct copy of the Agreed Order Resolving Motion to Compel and for Sanctions Pursuant to Rule 2004 is attached hereto as Exhibit P-2 and incorporated herein by reference.

Debtor's Bank of America business account;

(e)2)    The Debtor's federal income tax return for 2016 and all Form 1099s sent to subcontractors who worked for the Debtor on his construction projects from January 1, 2013 through January 31, 2017;

(k)    All job files concerning the Debtor's pre-petition construction from January 1, 2013 through January 31, 2017, including closing documents, HUD-1s, receipts, expense records, credit card receipts, and related records;

(m)    The invoices for the following expenditures:

1)    Ashley Furniture – $1,127.00;
2)    MPS-EP-Moto – $2,810.00;
3)    Adiamor wedding ring – $1,430.00;
4)    Mattress Plus – $1,999.00;

(o)    All documents relating to the bills and/or purchase price for items which the Debtor has claimed to be exempt property and related records concerning the acquisition of same;

(q)    In lieu of the actual credit card statements, a list of all credit card companies and account numbers for all credit cards used by the Debtor from January 1, 2013 through January 31, 2017;

(w)1)    The invoices and plans received from Letty Mata that correspond to the $3,620.00 of payments made by the Debtor to Ms. Mata from February to May, 2016; and

(zz)    To the extent not previously produced, all titles, insurance policies, and retail

installment contracts related to any of the automobiles in which the Debtor has an interest, including the 2008 Ford F-250, the 2013 Infinity, and the 2012 Audi Q-5.

Exhibit P-2, ¶ 5. Additionally, the Agreed Order Provided that Pamela Young could seek the documents in her remaining requests from the Debtor or any third party in Adversary No. 17-3009-hcm or Adversary No. 17-3010-hcm. Exhibit P-2, ¶¶ 2, 3, 4.

9.    Thereafter, Debtor produced some, but not all of the documents that were required to be produced under the Agreed Order. Specifically, the Debtor failed to produce the following documents:

(b)    the January 2017 bank statement and all checks for the period July, 2016 through January 2017;

(e)    any Form 1099s;

(k)    all job files including closing documents, receipts, expense records, credit card receipts;

(m)    invoices for the following expenditures:

1)    Ashley Furniture – $1,127.00;
2)    MPS-EP-Moto – $2,810.00;
3)    Adiamor wedding ring – $1,430.00;
4)    Mattress Plus – $1,999.00;

(o)    all documents relating to the bills and/or purchase price for the items which the Debtor has claimed to be exempt property;

(w)    the relevant invoices from Letty Mata;

(zz)    all titles, insurance policies and retail installment contracts related to automobiles.

10.    On December 1, 2017, Pamela Young filed her *Second* Motion to Compel, for Order of Civil Contempt, and for Sanctions Against Debtor Travis Ryan Young. [Doc. # 45].

11.    On December 12, 2017, this Court entered an Order Regarding Second Motion to Compel, Civil Contempt and Sanctions (Travis Young) (hereinafter the "Order") in which the Court granted Pamela Young's Second Motion to Compel and ordered Debtor to produce for inspection and copying documents responsive to the Requests set forth in the fifth paragraph of the Agreed Order as set forth above no later than December 27, 2017.[3] [Adv. Doc. # 106]. The Court further ordered, *inter alia*, that:

a.    By December 29, 2017, Mr. Travis Young shall also provide Plaintiff's counsel with a sworn written Response which shall set forth by each category of documents required to be produced by paragraph 5 of the Prior Order: (a) the responsive documents actually produced by Mr. Travis Young to Creditor's counsel; and (b) which requested documents could not be produced to Creditor's counsel because the documents do not exist. Mr. Travis Young may not respond to paragraph 5 of the Prior Order by stating that the documents have been or will be produced by some other person.

b.    If by December 27, 2017, Mr. Travis Young fails to produce the documents required by this Order, or if by December 29, 2017, Mr. Travis Young fails to provide the sworn Response required by this Order, then Mr. Travis Young will be in civil contempt of Court. In such event, Creditor will also be entitled to seek additional and further relief and sanctions from the Court against Mr. Travis Young, including without limitation, denial of Mr. Travis Young's bankruptcy discharge under 11 U.S.C. § 727(a)(6)(A).

---

[3]For the Court's convenience, a true and correct copy of the December 12, 2017 Order Regarding Second Motion to Compel, Civil Contempt, and Sanctions (Travis Young) is attached hereto as Exhibit P-3 and is incorporated herein by reference.

[Adv. Doc. # 48].

12. Debtor failed to produce any documents in response to the Order by December 27, 2017 and failed to provide the sworn written Response required by the Order by December 29, 2017. As of the date of this pleading, Debtor has not provided the undersigned counsel with any of the documents or the Response required by the Order.

13. However, the Debtor and his wife Brittany Young did provide the sworn Responses to Pamela Young's Requests for Production which were required by this Court in the Adversary Proceedings.[4] Despite testifying at his 2004 Exam that he and his wife Brittany Young had executed a written marital agreement two years ago in which they agreed that their bank accounts and income would be separate and despite refusing to produce any documents regarding Brittany Young's bank accounts and income, both Debtor's and Brittany Young's sworn Responses show that no such written marital agreement exists. See Exhibit P-4, Response to Request for Production No. 4; See Exhibit P-5, Response to Request for Production No. 52.

14. As a result of Debtor's failure and refusal to participate in discovery in this case, Pamela Young is now forced to file this *Third* Motion to Compel and for Sanctions

---

[4]A true and correct copy of Travis Young's Sworn Responses to Plaintiff's First and Second Requests for Production in Adversary Case No. 17-03009 is attached hereto as Exhibit P-4 and incorporated herein by reference. A true and correct copy of Brittany Young's Sworn Responses to Third Party Requests for Production in Adversary Case No. 17-03010 is attached hereto as Exhibit P-5 and incorporated herein by reference.

Against Debtor Travis Ryan Young.

### III. ARGUMENT & AUTHORITIES

15.    Bankruptcy Rule 2004 allows the Court, "on motion of any party in interest" to "order the examination of any entity." Fed. R. Bankr. P. 2004(a). "The purpose of a Rule 2004 examination is to show the condition of the estate and to enable the Court to discover its extent and whereabouts, and to come into possession of it, that the rights of the creditor may be preserved." *In re Express One Intern., Inc.*, 217 B.R. 215, 216 (Bankr. E.D. Tex. 1998)(*citing In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr.E.D.N.Y.1991)). "Rule 2004 is a procedural device that enables a party in interest to examine any entity to obtain information about the debtor's financial condition, matters that may affect the administration of the debtor's estate, right to a discharge, or operation of a business and the desirability of its continuance, sources of, and consideration for, money or property to consummate a plan, and other matters relevant to the case or formulation of a plan." *In re Daisytek, Inc.*, 323 B.R. 180, 187 (N.D. Tex. 2005). Pursuant to Local Bankruptcy Rule 2004(c), the Debtor's attendance and production of documentary evidence requested of an entity other than the Debtor shall comply with Bankruptcy Rule 9016.

16.    In this case, the Debtor has wilfully chosen not to comply with the Rule 2004 Notice, the Agreed Order, and the December 12, 2017 Order entered by this Court. Indeed, the Debtor decided to completely ignore this Court's December 12, 2017 Order. Due

to the Debtor's failure to produce all of the documents requested in the 2004 Exam Notice, Pamela Young has been unable to fully examine the financial condition of the Debtor or to analyze the transactions of the Debtor. This is significant because in order to obtain a discharge under 11 U.S.C. § 727(a)(3), a debtor has "an affirmative duty . . . to provide books and records 'accurately documenting his financial affairs.'" *In re Hughes*, 354 B.R. 801, 809 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Hughes v. Neary*, 386 B.R. 624 (N.D. Tex. 2008), *aff'd sub nom. In re Hughes*, 309 Fed. Appx. 841 (5th Cir. 2009). Indeed, "Creditors are not required to accept a debtor's oral recitations or recollections of his transactions; rather, to qualify for a discharge in bankruptcy, a debtor is required to keep and produce written documentation of all such transactions." *Id.*

17. As set forth above, the Debtor in this case has willfully failed to produce the requested records. This Court has previously ordered Debtor to produce the requested records pursuant to the Agreed Order and the Order, yet the Debtor has failed and refused to produce these records or to provide the sworn Response required by the Order. As the orders of this Court have thus far failed to impress upon Debtor his obligations under the Bankruptcy Code, the Debtor is in contempt of court and should be further sanctioned for his conduct.

18. "The authority to impose sanctions for contempt of an order is an inherent and well-settled power of all federal courts—including bankruptcy courts." *In re Brown*,

511 B.R. 843, 848 (Bankr. S.D. Tex. 2014)(*citing United States v. Fidanian*, 465 F.2d 755, 757 (5th Cir.1972); *Ingalls v. Thompson (In re Bradley)*, 588 F.3d 254, 266 (5th Cir.2009); *Placid Ref. Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.)*, 108 F.3d 609, 613 (5th Cir.1997). "The bankruptcy court may hold a person or entity in civil contempt for failing to comply with an order, such as an order issued pursuant to Bankruptcy Rule 2004." *In re Dieffenbacher*, 556 B.R. 79, 83 (Bankr. E.D.N.Y. 2016). "A movant seeking sanctions for contempt must establish by 'clear and convincing evidence' that 1) there was a court order in effect, 2) the order required specific conduct by the respondent, and 3) the respondent failed to comply with the court order." *Brown*, 511 B.R. at 848; *United States v. City of Jackson, Miss.*, 359 F.3d 727, 731 (5th Cir.2004); *see also In re Lothian Oil, Inc.*, 531 Fed.Appx. 428, 445 (5th Cir.2013).

19.     Sanctions for contempt are appropriate in this case because: (1) there was a court order in effect under Rule 2004, pursuant to the Agreed Order, and pursuant to the Order; (2) the 2004 Exam Notice, the Agreed Order, and the Order each required the Debtor to produce the documents set forth above and the Order required the Debtor to provide the sworn Response; and (3) the Debtor failed to comply with the 2004 Exam Notice, the Agreed Order, and the Order.

20.     As the Debtor is now in Contempt of this Court under paragraph 5 of the December 12, 2017 Order, this Court has broad discretion to impose judicial sanctions that

would coerce compliance with its orders and compensate the moving party for any losses sustained." *Denton v. Suter*, 2016 WL 6581288, at *3 (N.D. Tex. Mar. 10, 2016) (*citing Mary Kay Inc. v. Designs by Deanna, Inc.*, 2013 WL 6246484, at *4 (N.D. Tex. 2013). "For example, the "Court may impose a conditional fine, provided the amount is reasonably designed to force compliance without being punitive, and/or a fixed term of imprisonment, with the condition that the contemnor be released if he or she complies with the court order. The Court also may require that the contemnors pay reasonable attorney's fees incurred by the moving party in obtaining the contempt finding." *Id. (citing Mary Kay*, 2013 WL 6246484, at *4); *In re Collier*, 582 Fed. Appx. 419, 422 (5th Cir. 2014), *as revised* (Sept. 24, 2014)("Imprisonment is an appropriate remedy for either civil or criminal contempt, depending on how it is assessed. If the prison term is conditional and coercive, the character of the contempt is civil; if it is backward-looking and unconditional it is criminal.").

21.    Additionally, as made clear by the Order, where a debtor has disregarded his discovery obligations and violated the court's orders, a court may revoke or refuse to grant the debtor a discharge. 11 U.S.C. §727(a)(6)(the court shall grant the debtor a discharge unless the debtor has refused to obey any lawful order of the court); *see also In re Thilman*, 548 B.R. 1, 9 (Bankr. E.D.N.Y. 2016)(striking debtor defendant's answer in discharge proceeding and revoking discharge previously granted).

22.    Pamela Young requests that this Court enter an order denying Debtor his discharge

as a sanction for his refusal to comply with the 2004 Exam Notice, Agreed Order and Order. Debtor's non-compliance with these orders is willful. No less drastic alternative than a terminating sanction will suffice – Debtor has already been ordered to produce the requested documents several times. Debtor has failed to comply with the Agreed Order for almost six months, and has chosen to totally ignore the December 12, 2017 Order. No other remedy is adequate and therefore this sanction is appropriate. *See, e.g., Thilman*, 548 B.R. at 12.

23. In the alternative, Pamela Young requests that this Court enter an order directing Debtor to produce the documents requested within fourteen days of the date of the order and notifying him that failure to do so will result in the entry of an order denying his discharge under 11 U.S.C. §727(a)(6).

24. Pamela Young further requests that Debtor be sanctioned in the amount of $2,500.00 for attorney's fees incurred by Pamela Young in preparing and filing this motion and attending a hearing on same.

### III.  REQUEST FOR REFERRAL TO<br>UNITED STATES ATTORNEY

25. Pursuant to Section 3057 of Title 18 of the United States Code, Pamela Young asks the Court to report Debtor's false testimony under oath regarding the existence of the marital property agreement to the appropriate United States Attorney. Section 3057 provides in part,

> Any judge, receiver, or trustee having reasonable grounds for

believing that any violation under chapter 9 of this title or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed.

18 U.S.C. § 3057.

26.     Chapter 9 of the United States Code set forth crimes and criminal procedure related to bankruptcy. 18 U.S.C. § 151, *et seq.* Section 152 entitled "Concealment of assets; false oaths and claims; bribery" provides, in part:

A person who – (3) knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11; shall be fined under this title, imprisoned not more than 5 years, or both.

18 U.S.C. § 152. Section 157 entitled "Bankruptcy fraud" provides that:

A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so – (3) makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title, shall be fined under this title, imprisoned not more than 5 years, or both.

18 U.S.C.A. § 157(3).

27.     There exist reasonable grounds for believing that Debtor has violated Section 152 and 157 of Title 18. In his 2004 Exam, taken under oath, the Debtor testified that he

entered into a written marital agreement with Brittany Young approximately two years ago in which they agreed that their bank accounts and income would be separate property. See Exhibit P-1 at 24:11-25:17. Debtor refused to produce any bank account statements for Brittany Young at the 2004 Examination based on his allegation that they were her separate property. See Exhibit P-1 at 23:25-24:10; 49:8-12. Based upon Debtor's testimony, Pamela Young initiated third-party discovery against Brittany Young to obtain her records. Pamela Young has incurred significant expense in attempting to obtain records from Brittany Young including the filing of two motions to compel and for sanctions. After almost nine (9) months of discovery, Debtor and Brittany Young have now both sworn under oath, that they have no written marital property agreement in their possession. See Exhibit P-4, Response to Request for Production No. 4; See Exhibit P-5, Response to Request for Production No. 52.

28.    The Debtor has knowingly and fraudulently made a false statement under penalty of perjury in or in relation to a case under title 11 in violation of 18 U.S.C. § 152. The Debtor has also made a false or fraudulent representation for the purpose of executing a scheme or artifice to defraud his creditors in violation of 11 U.S.C. § 152. Under 18 U.S.C. § 3057 this Court is required to report Debtor's actions to the appropriate United States Attorney and Pamela Young requests that this Court do so.

**WHEREFORE, PREMISES CONSIDERED**, Pamela Young requests that this

Court enter an order:

a.  denying Debtor his discharge under 11 U.S.C. §727(a)(6);

b.  in the alternative, directing Travis Ryan Young to produce the requested documents within 14 days of the order and notifying him that failure to do so will result in the entry of an order denying his discharge under 11 U.S.C. §727(a)(6);

c.  directing Travis Ryan Young to pay the sum of $2,500.00 to Pamela Young for reasonable attorney's fees and expenses incurred in bringing this Motion and attending the hearing on same;

d.  referring Debtor's activities to the appropriate United States Attorney; and

e.  awarding Pamela Young such other relief as is just and equitable under the circumstances.

A copy of the proposed Order Granting Pamela Young's Third Motion to Compel and for Sanctions Against Debtor Travis Ryan Young is attached hereto as Exhibit P-6.

Respectfully submitted,

JAMES & HAUGLAND, P.C.
P.O. Box 1770
El Paso, Texas 79949-1770
Phone: 915-532-3911
FAX: (915) 541-6440

By: _____
Corey W. Haugland
State Bar No. 09234200
Attorney for Pamela Young

## CERTIFICATE OF SERVICE

I, Corey W. Haugland, hereby certify that on the 21st day of January, 2018 a true and correct copy of the foregoing Pamela Young's Third Motion to Compel and for Sanctions Against Debtor Travis Ryan Young was served on the following parties *via* electronic means as listed on the Court's ECF Noticing System:

Mr. Carlos A. Miranda, III
Miranda & Maldonado, P.C
5915 Silver Springs, Building 7
El Paso, Texas 79902


_____
Corey W. Haugland

Page 1

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

In re:                          )
                                )
TRAVIS RYAN YOUNG,              ) Case No. 17-30163-hcm
                                )
      Debtor.                   )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

TRAVIS RYAN YOUNG

APRIL 4, 2017

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

          The ORAL DEPOSITION of TRAVIS RYAN YOUNG,

produced as a witness at the instance of Pamela Young,

and duly sworn, was taken in the above-styled and

numbered cause on Tuesday, April 4, 2017, from 10:26

a.m. to 1:06 p.m., before Mary Procell, CSR in and for

the State of Texas, reported by machine shorthand, at

the offices of Associated Court Reporters, 221 North

Kansas, Suite 550, El Paso, Texas, pursuant to the

Federal Rules of Civil Procedure.

CERTIFIED: _____  PREPARED FOR: _____

**EXHIBIT**

*P-1*

## Page 2

APPEARANCES

FOR THE DEBTOR:
Mr. Michael R. Nevarez
The Law Offices of Michael R. Nevarez
P.O. Box 12247
El Paso, Texas 79913
FOR PAMELA YOUNG:
Mr. Corey W. Haugland
James & Haugland, P.C.
609 Montana Avenue
El Paso, Texas 79902
Also Present:
Pamela Young

INDEX
WITNESS:                                    Page
TRAVIS RYAN YOUNG
  EXAMINATION BY MR. HAUGLAND            4
EXHIBITS
1  Notice of Intent to Conduct Rule 2004     5
   Examination Duces Tecum of Debtor,
   Travis Ryan Young
2  Premier Builders Inventory List         42
3  Voluntary Petition for Individuals        55
   Filing for Bankruptcy of Travis Ryan
   Young, 51 pages
4  Statement of Financial Affairs for        55
   Individuals Filing for Bankruptcy for
   Travis Ryan Young
5  Amended Statement of Financial Affairs    56
   for Individuals Filing for Bankruptcy
   for Travis Ryan Young
6  Copy of check to FirstLight from         64
   Travis R. Young, dated 12/21/15
7  Copy of check to FirstLight from         64
   Travis R. Young, dated 1/15/16
8  Copy of check to Accurate Collision      64
   from Travis R. Young, dated 2/4/16

## Page 3

CERTIFICATION                              66
CHANGES AND SIGNATURE PAGE                 67

## Page 4

TRAVIS RYAN YOUNG,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. HAUGLAND:
Q. Please state your complete name for the
record.
A. Travis Ryan Young.
Q. And where do you reside?
A. El Paso, Texas.
Q. What address?
A. 6647 Mariposa, El Paso, Texas 79912.
Q. And how long have you lived at that address?
A. About five years now.
Q. What is your date of birth?
A. 11/18/82.
Q. What is your Texas driver's license number?
A. I don't know it offhand. 17632530.
Q. Did I ask your date of birth?
A. Yes.
Q. Where were you born?
A. El Paso, Texas.
Q. And where were you raised?
A. El Paso, Texas.
Q. Where did you go to high school?
A. Cathedral High School.

## Page 5

Q. What year did you graduate?
A. 2001.
Q. Have you ever provided a deposition before?
A. No.
Q. You are doing well. You're answering my
questions audibly, which helps the court reporter make a
record. If you don't understand any of my questions,
ask me to rephrase, and I'll be glad to do so. If you
need to take a break for any reason, ask to take a break
and you can do so.
     We met yesterday in order for you to
produce documents pursuant to a Notice of Intent to
Conduct Rule 2004 Examination Duces Tecum, correct?
A. Yes.
     (Exhibit marked, 1.)
Q. (BY MR. HAUGLAND) I'm going to hand both you
and your attorney a copy of that notice, which we should
mark as Exhibit 1.
     I want to confirm those things that were
produced by you yesterday, and I'll show it to you as we
talk about them. The first file you produced was Bank
of America check statements, correct?
A. Right.
Q. Is that for 2014 through 2016?
A. Yes.

## Page 6

1      Q.   Was this a personal account or is this a
2  business account?
3      A.   Those are personal accounts.
4      Q.   During this time frame did you maintain a
5  separate checking account for the business?
6      A.   In 2014 I had a separate account, the 8381,
7  which was a business one, but still under the sole
8  proprietorship.
9      Q.   Do you have a college degree?
10     A.   Yes.
11     Q.   What degree do you have?
12     A.   It's in civil engineering.
13     Q.   Where did you obtain it?
14     A.   New Mexico State University.
15     Q.   When did you graduate?
16     A.   2006.
17     Q.   After graduating who did you go to work for?
18     A.   I worked for Dantex Construction.
19     Q.   In what capacity?
20     A.   I started as a manager there.
21     Q.   Who was your immediate supervisor?
22     A.   I think his name was Tom -- I don't remember
23  his last name.  Tom -- I would have to think about that.
24     Q.   How long did you work for Dantex?
25     A.   About two years.

## Page 7

1      Q.   And where did you go to work after that?
2      A.   That's when I started the home building after
3  that.
4      Q.   Did you build homes for Dantex?
5      A.   No.  Dantex was commercial.
6      Q.   So you started home building in 2008; is that
7  right?
8      A.   It was late 2008, early 2009, I believe.
9      Q.   Did you do that in your individual name or did
10  you use a d/b/a?
11     A.   It was Travis Ryan Young d/b/a Premier
12  Builders.
13     Q.   Did you file an assumed name certificate with
14  the county clerk?
15     A.   Uh-huh.  Yes, I did.
16     Q.   For whom did you build your first home?
17     A.   It was -- well, it was a spec house, but then
18  the people that bought it were the Chaffees.  Their last
19  name was Chaffee.
20     Q.   What did the house sell for?
21     A.   Around $300,000, I believe.
22     Q.   Where did you get the financing to build a
23  spec house?
24     A.   It was from my dad.
25     Q.   What's your father's name?

## Page 8

1      A.   Keith Young.
2      Q.   Did you make a profit from that house?
3      A.   I did.
4      Q.   Approximately how much?
5      A.   I would say like 40-, 45,000.
6      Q.   When did you complete construction of that
7  house?
8      A.   It was probably 2010.  No -- yes, 2010.
9      Q.   Did you start any new construction before you
10  finished that house, or did you wait until you finished
11  that house before starting something else?
12     A.   Yes, I waited till that one was finished and
13  sold.
14     Q.   With regard to the construction of the house,
15  what is it exactly that you do in building the houses
16  that you build?
17     A.   I mean, I would do everything back then, do
18  the budget for it, run the -- get the subcontractors,
19  supervise, manage it.
20     Q.   Where did you get your plans for building the
21  house?
22     A.   From a drafter.  And we designed it.
23     Q.   Did you design the houses, or did someone else
24  design the houses?
25     A.   I mean, they would be kind of my idea, but

## Page 9

1  they would -- of course, they are drafters, so they
2  would draw them on the AutoCAD.
3      Q.   Who did you use to draw the plans for the
4  first house?
5      A.   Who did that one?  He was somebody that I
6  worked with at Dantex.  I would have to look up his
7  name.  I don't remember his name.
8      Q.   What kind of subs did you have to hire to
9  build the house?
10     A.   Each sub was specialized in their area:
11  Separate roof subcontractor, plumbing contractor,
12  et cetera.
13     Q.   I guess what I'm trying to find out is, do you
14  build any part of the house yourself, with your own
15  hands?
16     A.   I would do some work back then on my own,
17  finish work, tile work, but after that house I didn't.
18     Q.   So how many subs would you have on the
19  construction of this house?  You said roofing, plumbing.
20     A.   Probably would be about 12 to 15.
21     Q.   After completing this house in 2010, did you
22  start the construction of another house?
23     A.   Yes, I did.
24     Q.   For whom?
25     A.   It was another spec house.

Page 10

1  Q. Did you sell this house?
2  A. Uh-huh.
3  Q. To whom?
4  A. That one was to -- it was a realtor. Her name
5  was Linda.
6  Q. Can you remember her last name?
7  A. McDaniel.
8  Q. What was this house sold for?
9  A. I think 320-, I want to say.
10 Q. Did you make a profit on the sale?
11 A. That one -- as far as you mean profit after
12 tax, doing all the -- deducting costs?
13 Q. After all the costs.
14 A. That one, probably like 20,000.
15 Q. Just out of curiosity, what kind of profit
16 margin were you looking for out of the construction of
17 these homes?
18 A. I mean, that was during the bad economy time,
19 so I wasn't looking for a huge profit, but more than
20 that. But that house sat for about -- I don't know --
21 eight months while it was for sale.
22 Q. When did you complete the construction of the
23 property?
24 A. That one, I want to say 2011.
25 Q. Who provided the financing to build the house?

Page 11

1  A. My father did.
2  Q. When did you start building the next house
3  that you built?
4  A. Everything -- every one was subsequent. So
5  after 2011 would be the following.
6  Q. Would you have built it before you sold the
7  house to Linda McDaniel, or would you have built it
8  after you completed the construction?
9  A. It was after.
10 Q. After it was sold?
11 A. Uh-huh, after it was sold.
12 Q. So did you start that house in 2012 or 2011?
13 A. It's hard to say. I'm not sure. Could have
14 been late 2011, early 2012.
15 Q. Whose home was this? Or was this another spec
16 house?
17 A. Yes. I was just building specs all then --
18 all at that time. I don't remember whose that one was.
19 Q. You don't recall who you sold it to?
20 A. Huh-uh.
21 Q. When did you finish construction?
22    MR. NEVAREZ: When you answer, say yes or
23 no.
24    THE WITNESS: Oh, sorry.
25    MR. NEVAREZ: Don't do huh-uh. That

Page 12

1  doesn't show up.
2  A. Okay. Repeat, please.
3  Q. (BY MR. HAUGLAND) You can't remember who you
4  sold the house to?
5  A. No, I don't remember those folks.
6  Q. When was the next house that you built?
7  A. It was probably 2012 as well.
8  Q. Was this another spec house?
9  A. That one was a presale.
10 Q. To whom?
11 A. I remember their last name was Hollands.
12 Q. Can you remember where the house was located?
13 A. It was on Brays Landing.
14 Q. And how much did that house sell for?
15 A. It was about 320- as well.
16 Q. I didn't ask about the third house. Who
17 provided the financing to build the third house?
18 A. My father did.
19 Q. Who provided the financing to build this
20 fourth house for the Hollands?
21 A. My father.
22 Q. When did you get the Hollands' home finished?
23 A. 2012.
24 Q. Whose house did you build next?
25 A. I built a spec house after that again. Which

Page 13

1  one was it? I think that was Franklin Trail.
2  Q. Was the house sold?
3  A. Uh-huh.
4  Q. To who?
5  A. It was sold to a doctor. I think his last
6  name was Kidd.
7  Q. Can you remember the sales price?
8  A. That one was 415-.
9  Q. Did you make a profit on it?
10 A. I made probably -- after all the costs and
11 everything, it was probably like 35,000.
12 Q. Who provided the financing for building that
13 house?
14 A. My father.
15 Q. When was that house completed?
16 A. 2013.
17 Q. What was the next house that you built?
18 A. I built one for -- the next one was Calle
19 Alta.
20 Q. How do you spell that?
21 A. C-A-L-L-E, and another separate word, A-L-T-A.
22 Q. And for whom did you build this home?
23 A. That was for the Rioses.
24 Q. What did it sell for?
25 A. That was their own land, and they financed

## Page 14

1     that one. So there really wasn't a sales price. Well,
2     I think I charged them like 380,000, because they
3     already had the land.
4        Q. Did you make a profit on it?
5        A. Probably about 35,000 or so.
6        Q. And who financed -- they financed this one?
7        A. Uh-huh.
8        Q. When was this house completed?
9        A. 2013.
10        Q. Were you getting faster at building homes, or
11     were you starting to build them simultaneously?
12        A. I mean, my dad was limited to what he was
13     giving out, so that's why -- I was building Franklin
14     Trail and then Calle Alta at the same time, because
15     they -- I mean the owners were financing it. That's
16     usually how presales go. The owners are supposed to
17     finance them.
18        Q. What was the next house you built after the
19     Calle Alta?
20        A. That was hers (indicating).
21        Q. Pam Young's?
22        A. Your client's, yes.
23        Q. And who financed the construction of that
24     house?
25        A. My father did.

## Page 16

1        A. It was in 2014.
2        Q. When was Silver Star completed?
3        A. It was completed in 2-- at the end of 2015,
4     and it was sold in 2016. Silver Star was a spec house.
5        Q. What did Silver Star sell for?
6        A. 675-.
7        Q. Did you make a profit?
8        A. No.
9        Q. Montoya Oak, when did you complete it?
10        A. That was completed in 2015.
11        Q. When was it sold?
12        A. It was 2015 as well. The owners had owned the
13     lot, and my father had financed for them, so it was kind
14     of a presale/spec built -- well, it was an awkward
15     situation.
16        Q. Who were the buyers?
17        A. The people who owned that lot were -- it was
18     Rebecca Wisbrun. She is also known by six names. I'm
19     not sure all of them. She is R.W. Schwartz.
20        Q. Rebecca Reza?
21        A. Yes. She is known by Rebecca Reza, Rebecca
22     Wisbrun, R.W. Schwartz. I don't know her other ones.
23        Q. Do you know why she has so many names?
24        A. I don't think they are the most ethical of
25     people.

## Page 15

1        Q. And what was the sales price of that house?
2        A. 536-.
3        Q. Did you make a profit on that house?
4        A. Not really.
5        Q. Was this the first home you constructed that
6     you didn't make a profit?
7        A. That probably was, yes. That's when it
8     started.
9        Q. Who designed the plans for the house?
10        A. That house was -- his name was Rafcad.
11        Q. How do you spell that?
12        A. R-A-F-C-A-D.
13        Q. Does that person live in El Paso?
14        A. Yes, he does.
15        Q. Is he an architect?
16        A. He is a drafter.
17        Q. Is he independent or does he work for someone?
18        A. No. He is independent.
19        Q. What was the next house that you built?
20        A. At that time I was doing Silver Star and
21     Montoya Oak at the same time.
22        Q. Have those been completed?
23        A. Uh-huh. Yes, they have.
24        Q. First of all, when was Pam Young's house
25     completed?

## Page 17

1        Q. What did that house sell for?
2        A. That one, the contract was for 408,000. That
3     was with the pool.
4        Q. Did you realize a profit on this property?
5        A. No, I didn't.
6        Q. Did you make a profit on -- you didn't make a
7     profit on Silver Star either?
8        A. Huh-uh.
9        Q. Who financed Silver Star?
10        A. Well, that was a mix of my father and those
11     Jet loans. And I had those properties so long that the
12     Jet loans got very expensive.
13        Q. And who financed Montoya Oak?
14        A. My father did that one.
15        Q. After Montoya Oak, what was the next property
16     you built?
17        A. Well, Silver Star was really after Montoya
18     Oak, and Silver Star was my last one.
19        Q. So you haven't been employed since the end of
20     2015?
21        A. Well, I sold it the beginning of 2016, that
22     Silver Star house. And, yes, that's -- that was the end
23     of the d/b/a.
24        Q. Did you go to work for somebody else at that
25     point in time?

## Page 18

1   A. No. Well --
2   Q. 2016.
3   A. I didn't know what I was going to do for a few
4   months, and that's when my wife opened her company.
5   Q. What's your wife's name?
6   A. Brittany Young.
7   Q. What's her maiden name?
8   A. Jackson.
9   Q. And when did you get married?
10  A. It was in 2014.
11  Q. Do you know the date?
12  A. August.
13  Q. August what?
14  A. The end of August, I believe. August 23 or
15  24.
16  Q. Of 2014?
17  A. Uh-huh.
18  Q. Is your wife from El Paso?
19  A. She is from Las Cruces.
20  Q. Does she have a degree?
21  A. Yes, she does.
22  Q. What is her educational background?
23  A. It's in -- she got her first degree in
24  communications, and then she got a secondary degree in
25  education.

## Page 19

1   Q. At New Mexico State?
2   A. Yes.
3   Q. Is that where you met her?
4   A. I met her down here, actually.
5   Q. Do you have any children?
6   A. We just had one child.
7   Q. How old is the baby?
8   A. She is seven months now.
9   Q. Is your wife employed?
10  A. No.
11  Q. Has she ever been employed while you have been
12  married to her?
13  A. Through EPISD.
14  Q. When did she work for the school district?
15  A. She worked 2015 and part of 2016.
16  Q. Has she not worked since she had the baby?
17  A. Yes.
18  Q. You sound better today.
19  A. A little bit.
20  Q. Are you still getting over --
21  A. I had my cold and then I got better, and then
22  I got it again.
23  Q. You sound a little better today than you did
24  yesterday.
25      Now let's talk about the document

## Page 20

1   production, because we are kind of at that point. The
2   first category of documents that we requested were those
3   "documents relating to savings bank books, records,
4   accounts and memoranda, current as well as those that
5   may have been canceled, whether in your name or your
6   spouse's name, individually or jointly, or in connection
7   with any other person or persons." We asked for these
8   records for January 1, 2013 through January 31, 2017.
9       And the first file of documents that you
10  provided were from December 25, 2013 through January 26,
11  2015, your Bank of America account in your name of
12  Travis R. Young; is that correct?
13  A. Yes.
14  Q. The address for the bank statements is 4532
15  Rhea, R-H-E-A, Lane, El Paso, Texas 79924-1746. For
16  what period of time did you live at that address?
17  A. That account was like about nine years old,
18  and so it was just always my parents' address. I never
19  changed it.
20  Q. So that's your parents' address?
21  A. Uh-huh. Yes.
22  Q. And did you ever use the bank account as a
23  business account for your d/b/a Premier Builders?
24  A. It was.
25  Q. For what period of time?

## Page 21

1   A. The time before I opened the other -- 8381.
2   Q. That's likewise a Bank of America account,
3   correct?
4   A. Yes.
5   Q. And it appears that this account, the
6   documents produced are for March 1, 2014 --
7   A. Yes. That's when it was opened.
8   Q. -- through December 31, 2014. Does that sound
9   about right?
10  A. No. It should be up to the 2017. Oh, yes.
11  That was one of the --
12  Q. Let me hand you the file.
13  A. Okay. This one is 2014. The other ones are
14  2015 and 2016.
15  Q. Okay.
16  A. So this was just 2014.
17  Q. This is just 2014?
18  A. Uh-huh.
19  Q. Is this just 2015 in this file?
20  A. Uh-huh. Yes.
21  Q. And then --
22  A. Yes, 2016.
23  Q. This Bank of America statement that you have
24  listed as Travis R. Young, Sole Prop -- or sole
25  proprietor, d/b/a Premier Builders, was this just a

## Page 22

1    business account?
2        A. No. I mean, since I was sole proprietor, I
3    used it for both purposes.
4        Q. And this one came to 6647 Mariposa Drive?
5        A. Right.
6        Q. And that's your -- is that your homestead?
7        A. Yes.
8        Q. And you have lived there since when?
9        A. Early 2011.
10       Q. The account appears to have been closed in
11   June of 2016; is that right?
12       A. Which account? The 8381?
13       Q. The 8381 account at Bank of America.
14       A. No. It's still open, I mean to this day.
15   It's just not being utilized.
16       Q. Do you not have any bank statements after June
17   of 2016?
18       A. I did. I figured they were to 2017 in there.
19       Q. That's when they end, is in June of 2016.
20       A. I had these printed at Office Depot, and maybe
21   they didn't get the rest.
22       Q. If you would check on that, I would appreciate
23   it.
24       A. I will.
25       Q. So you have not closed the account?

## Page 23

1        A. No.
2        Q. Have you turned those bank statements over to
3    the Chapter 7 trustee, Mr. Ingalls?
4        A. Yes, up till the date I filed, and the
5    previous six months from then. And I'm pretty sure
6    Cheryl put them in with the filing.
7        Q. Since opening the sole proprietorship account
8    in 2014, have you maintained any other bank accounts?
9        A. I still kept the personal one, but I didn't
10   use it all that much.
11       Q. Is that the first one we saw --
12       A. Yes.
13       Q. -- the --
14           And is it still open also?
15       A. No. Those ones are closed.
16       Q. The personal account is closed?
17       A. Yes.
18       Q. When did you close them?
19       A. They closed them because there was no
20   activity. So it was probably -- I think the last
21   statement is close to when it was closed, the last month
22   in there.
23       Q. The one that you produced?
24       A. Uh-huh.
25       Q. Has your wife maintained a separate bank

## Page 24

1    account during the time that you have been married?
2        A. Yes, she has.
3        Q. Have you produced the statements for that
4    account?
5        A. For the bankruptcy.
6        Q. For the 2004 examination.
7        A. Oh, no.
8        Q. Why not?
9        A. Because those are her separate accounts that
10   she has had.
11       Q. Have you and your wife ever entered into a
12   premarital agreement to keep your assets separate during
13   your marriage?
14       A. We have had a marital agreement that her
15   accounts would be the same and --
16       Q. Is there a written agreement?
17       A. Yes.
18       Q. There's a written premarital agreement?
19       A. Not premarital, just a marital agreement.
20       Q. And it's in writing?
21       A. Uh-huh. Yes.
22       Q. Who prepared it?
23       A. Her and I did.
24       Q. When was it prepared?
25       A. I would say about two years ago.

## Page 25

1        Q. What are the key terms of that written marital
2    agreement with Brittany?
3        A. Just that her bank statement -- her bank
4    accounts stay hers, her income that she would make would
5    stay hers, and mine would stay mine.
6        Q. Do you have a mortgage on your homestead?
7        A. There is a mortgage.
8        Q. Who is it with?
9        A. It's with Kathleen Hernandez. That's a
10   wraparound deed, so the main mortgage holder is still a
11   bank called Colonial Savings.
12       Q. Who makes the mortgage payments every month?
13       A. I pay directly to Colonial Savings.
14       Q. The written marital agreement with your wife,
15   does it have any other terms besides keeping the bank
16   accounts separate and having the income stay separate?
17       A. I mean those are the main terms of it.
18       Q. Have you attempted, at the end of any year, to
19   divide your property with your wife, as to who and what
20   belongs to whom?
21       A. No, never.
22       Q. Have you ever had a bank account in the name
23   of Bay Homes?
24       A. No. Bay Homes was never a sole
25   proprietorship.

Page 26

1    Q. What was Bay Homes?
2    A. Bay Homes is a d/b/a of my wife's LLC.
3    Q. What LLCs does your wife own?
4    A. Premier Builders & Design, LLC and RUF
5  Developers, LLC.
6    Q. And Bay Homes is a d/b/a for which?
7    A. Premier Builders & Design, LLC.
8    Q. Since 2016 have you worked for your wife's
9  LLCs in building homes?
10   A. Yes.
11   Q. When did you go to work for Premier Builders &
12 Design, LLC?
13   A. It was about April -- no -- March of 2016.
14   Q. How many homes has Premier Builders & Design,
15 LLC built since you went to work for it in March 2016?
16   A. From ground up, they are still just doing one.
17   Q. And when did you go to work for RUF Builders,
18 LLC?
19   A. RUF is just -- they just own a lot. It hasn't
20 been organized, really. I mean, it hasn't been -- it
21 hasn't had any assets, really, beside just owning a lot.
22   Q. The Premier Builders house that's being built,
23 is that a presale or is that a spec house?
24   A. It's a spec.
25   Q. Where is it located?

Page 27

1    A. It's on 354 Rocky Point.
2    Q. Who is providing the financing for it?
3    A. My father is.
4    Q. What's your projected sales price for this
5  house?
6    A. It's hard to say. It's a difficult area.
7  Right now it's listed at 898-, but it could go for 800-.
8    Q. Do you know what costs you have in that
9  property?
10   A. No, I don't.
11   Q. What has been your job title and
12 responsibilities for Premier Builders & Design, LLC with
13 regard to the construction of the Rocky Point house?
14   A. Just managing the build aspects of it.
15   Q. What has your wife done for Premier Builders &
16 Design, LLC with regard to the construction of 354 Rocky
17 Point?
18   A. She retains the contracts for the
19 subcontractors. She does the accounting. She does -- I
20 mean, she does the business side of it, makes the phone
21 calls to the City, makes phone calls.
22   Q. What's your salary with Premier Builders &
23 Design?
24   A. We haven't come to an agreement yet, since it
25 hasn't had any income from the build.

Page 28

1    Q. Do you have a salary with RUF Builders, LLC?
2    A. No.
3    Q. Do you have an agreement concerning a salary
4  that you will get in RUF Builders, LLC?
5    A. No.
6    Q. Does your wife get a salary in Premier
7  Builders & Design, LLC?
8    A. No, she doesn't.
9    Q. With regard to your d/b/a Premier Builders,
10 did you have a salary with Premier Builders?
11   A. No, I never did. Since most of the houses
12 were spec homes, I had to wait until they were sold.
13   Q. Did your wife have a salary with the d/b/a
14 Premier Builders?
15   A. No, she didn't.
16   Q. Did your wife ever perform services for
17 Premier Builders?
18   A. No.
19   Q. When your father was financing the properties
20 for Premier Builders, what terms was he giving you for
21 the financing?
22   A. I mean before I ran into all the problems with
23 her (indicating) -- I mean, he was helping me get
24 started with the business, so he would take just like
25 10,000. But he didn't even take an interest in --

Page 29

1  interest on hers.
2    Q. So he wouldn't provide conventional financing
3  where he charged interest on the money loaned. He was
4  just taking a set fee of $10,000 per loan?
5    A. Once I finished he would say, Okay. What did
6  you make on it? And then -- but the whole time he was
7  mainly doing it, helping me get started with the
8  business.
9    Q. So would it be fair to say that you would come
10 to an agreement on what you would pay him back after you
11 got the house built and sold?
12   A. For the most part, yes.
13   Q. When the financing was being provided, were
14 you documenting the loan in any way?
15   A. I would put -- before hers I would just put it
16 on my spreadsheet, what I would put into it, into each
17 build. Then once it sold we would go over it. So we
18 never filed deeds or anything.
19   Q. Well, you wouldn't file a deed of trust?
20   A. Right.
21   Q. Would you ever sign a note?
22   A. No.
23   Q. So the last property that you did under your
24 d/b/a was Silver Star, correct?
25   A. Yes.

## Page 30

1  Q. And that was financed by your father?
2  A. Correct.
3  Q. And was your father paid in full for --
4  A. Yes.
5  Q. -- his loan on that property?
6  A. Yes, it was, because that's when I split the
7  Jet loan to part of it, and then he financed part of it.
8  Q. Was the Jet loan paid in full?
9  A. Yes.
10  Q. And I think you indicated that the next
11  property you built was the one for your wife's company,
12  Premier Builders, LLC?
13  A. Right.
14  Q. And your father is providing the financing on
15  that property?
16  A. Yes, he is. It also has another lien from the
17  developer.
18  Q. Who is the developer?
19  A. High Mountain. High Mountain, Limited.
20  Q. Who is the person behind High Mountain,
21  Limited?
22  A. It's Richard Thomas.
23  Q. How much is his lien?
24  A. It's 100,000, I believe.
25  Q. Have you personally guaranteed that lien?

## Page 31

1  A. No. I mean, I don't know if my wife has. I
2  don't believe she did.
3  Q. So there's no personal guarantees on the loan
4  by Richard Thomas to Premier Builders & Design, LLC?
5  A. No.
6  Q. Is there a promissory note?
7  A. Yes, there is.
8  Q. Is there a deed of trust?
9  A. Yes.
10  Q. Is the loan for the purchase of the lot?
11  A. Yes.
12  Q. The financing that's been provided by your
13  father, is there a promissory note?
14  A. Yes, there is.
15  Q. Is there a deed of trust?
16  A. Yes.
17  Q. Is there an interest rate called for in the
18  promissory note with your father?
19  A. I would have to verify if it did. One of my
20  old attorneys did that paperwork.
21  Q. Who was that, the attorney?
22  A. It was Kirk.
23  Q. Bud Kirk?
24  A. Uh-huh.
25  Q. Have you done any other work since the first

## Page 32

1  part of 2016, other than build the house with Premier
2  Builders & Design, LLC?
3  A. We did a little renovation in Las Cruces for
4  her friend -- her friend's dad who passed away.
5  Q. Did the friend pass away or the friend's --
6  A. The friend's father.
7  Q. What's the friend's name?
8  A. It was Darby Snow.
9  Q. Was there a contract for this work?
10  A. Well, the father died and they were trying
11  to -- they couldn't find anybody to sell the house
12  because it was like a hoarder house, and so they asked
13  us -- they asked my wife if she wanted to buy it.
14  Q. They --
15  A. They were almost going to condemn it, the
16  City, and the wife couldn't afford to have two house
17  payments.
18  Q. The wife -- whose wife?
19  A. The wife of the guy who passed away.
20  Q. She had two house payments?
21  A. Well, his -- because they were living
22  separate. And so when he passed away she couldn't keep
23  that house afloat and her own personal residence.
24  Q. So was the house deeded to your wife?
25  A. It was deeded to the LLC.

## Page 33

1  Q. Which LLC?
2  A. Premier Builders & Design, LLC.
3  Q. So what work had been done on this house since
4  it was deeded to Premier Builders & Design?
5  A. It was remodeled and sold.
6  Q. What repairs were done to this house?
7  A. It was extensive. The whole back part of the
8  house had to come off. Roof redone, electrical,
9  plumbing, kitchen, all new tile, carpet, garage doors,
10  new doors. It was a lot of work.
11  Q. And when did you do this work?
12  A. In March or April of -- no -- April of 2014 --
13  2016. April and May, I believe.
14  Q. And when was it sold?
15  A. In June.
16  Q. Of 2016?
17  A. Yes.
18  Q. How much was it sold for?
19  A. 130-, I want to say.
20  Q. What was the property acquired for? What was
21  your purchase price?
22  A. 89-, I believe.
23  Q. How much money was put into the house to fix
24  it up?
25  A. I don't know offhand. I would have to see.

Page 34

1   Like I said, we haven't done the taxes this year so —
2   or she hasn't done the taxes.
3        Q.  Did you make money on the property?
4        A.  No, because we were just helping a friend.  I
5   mean after all the costs, just driving up there —
6        Q.  So was this job done before you started
7   building the house at 354 Rocky Point?
8        A.  Yes.
9        Q.  Who funded the remodeling job in Las Cruces?
10       A.  My father did.
11       Q.  What interest or profit did your father take
12   on this job?
13       A.  There wasn't much to be taken, so I think he
14   only took like 1,000.  First we bought it just to
15   wholesale it, but nobody wanted it because it was in too
16   bad a condition.
17            MR. NEVAREZ:  Is this a good time to
18   break?
19            MR. HAUGLAND:  Sure, we can take a break.
20       (A break taken, 11:26 to 11:38.)
21       Q.  (BY MR. HAUGLAND)  Let's talk about some of the
22   production of documents in this matter.  We asked you to
23   provide a ledger for Premier Builders, the d/b/a.
24       A.  Uh-huh.
25       Q.  Let me hand you a file.  Is that what those

Page 35

1   documents are there?  Is that the ledger that you
2   prepared for Premier Builders?
3        A.  Yes.
4        Q.  And I numbered the documents you produced
5   yesterday in my office, so that ledger starts at Travis
6   00435 and goes through Travis 00453; is that right?
7        A.  Yes.
8        Q.  How would you know what entries to put in the
9   ledger as compared to the checks that were written on
10   the account during that time frame?
11       A.  When I would write a check I would put it on
12   there, if that's what you are asking.
13       Q.  Would you have every check in the account on
14   your ledger?
15       A.  Well, they should be, yes.  Yes.
16       Q.  Would there ever be checks written out of the
17   account that would not end up on the ledger?
18       A.  No.
19       Q.  The checks that were produced in response to
20   the request for production, are these all out of one
21   account, or are they mixed together between the accounts
22   that you had during this time frame?
23       A.  That's just one account, the 8381.
24       Q.  And is that the same account that was used to
25   create the ledger for the business?

Page 36

1        A.  Yes.
2        Q.  Have you ever had a savings account?
3        A.  It was just that personal one, with the
4   personal documents, but no money was really kept in it.
5        Q.  Is it Bank of America?
6        A.  Yes.
7        Q.  Have you ever had a retirement account?
8        A.  No.
9        Q.  Have you ever had a stock brokerage account?
10       A.  No.
11       Q.  Let's talk about the tax returns that have
12   been produced.
13       There's one more in here, too.
14       Q.  All right.
15       That's the other part of 2015 and then 2013.
16       Q.  So in 2013 -- where were you living in 2013?
17       A.  At the Mariposa house.
18       Q.  And your income is reflected as $28,190 in
19   2013.  And that's self-employment income from operation
20   of your business?
21       A.  Correct.
22       Q.  And in 2014 where were you living?
23       A.  The Mariposa house.
24       Q.  And your business income is claimed at
25   $21,500; is that correct?  Do you want to see?

Page 37

1        A.  Yes, let me see.  Yes.  But I had to -- I
2   think I amended the 2015 one.
3        Q.  This is 2014.
4        A.  Right.
5        Q.  You think you amended 2014?
6        A.  Because I didn't put the interest on the Jet
7   loan in 2014, so I carried it over to the 2015.  So it
8   should have been 2014, but in 2015 I didn't use the
9   accountant to do it.
10       Q.  So in 2015 did you prepare your tax return
11   yourself?
12       A.  Yes.
13       Q.  And this is the one you think you have had to
14   amend?
15       A.  Yes.
16       Q.  Did you use the same accountant to do the
17   amended return, Vargas CPA, PC?
18       A.  Not in 2015.  I mean -- yes, not in 2015 --
19       Q.  Who did you use?
20       A.  -- return.
21       I didn't use anybody.
22       Q.  Who did the amended return?
23       A.  No, no, no.  I was saying that the costs from
24   2014, we didn't put the interest on, so I put them on
25   the 2015 one.

## Page 38

1    Q. So in 2015 was your claimed business income
2  $3,835?
3    A. Yes.
4    Q. But your sales for 2015 in Premier Builders
5  was $388,500?
6    A. Right.
7    Q. In 2016 do you have any idea what your income
8  was?
9    A. It was on the bottom of the other summary, 356
10  Silver Star. I think it was under the financial
11  statements folder. I'm not sure offhand. It was at the
12  bottom of it.
13    Q. Let me hand you the Silver Star documentation
14  you are referencing.
15    A. So Silver Star, the net profit, I mean without
16  doing tax deductions, was 10,000.
17    Q. $10,108.27?
18    A. Yes.
19    Q. That's your earned income for calendar year
20  2016?
21    A. Right.
22    Q. Will you be preparing your 2016 tax return for
23  filing on or before April 15 of this year?
24    A. I probably will.
25    Q. Are you going to do it yourself, or are you

## Page 39

1  going to ask for assistance?
2    A. I will probably have assistance, just to make
3  sure.
4    Q. Are you using Vargas?
5    A. No, I'm not.
6    Q. Why not?
7    A. The girl who I used to work with under him,
8  she left his office, so I don't use him anymore.
9    Q. Who is the person you use?
10    A. Her name was Tammy, I believe. Tammy -- I
11  would have to get it for you. She actually left in
12  2014, and that's why I didn't do 2015 there. Or she
13  left sometime during that time.
14    Q. With regard to the request for production on
15  deeds and conveyances of real property in your name or
16  your spouse's name, I'm going to hand you the file that
17  includes the deeds that you provided here, and I would
18  like you to identify the properties that have been
19  deeded into your name in the last five years that you
20  have produced here.
21    A. This is 356 Silver Star. This was her
22  (indicating) property.
23    Q. Whose property?
24    A. Pam's.
25    This was my personal residence.

## Page 40

1    Q. Okay.
2    A. Personal residence. The Franklin Trail. This
3  was the Silver Star, which I was financing, and the
4  Silver Star financing, and Silver Star transfer of deed.
5  And this is just mortgage information.
6    Q. The Colonial information is mortgage for what?
7    A. My property.
8    Q. Your home?
9    A. Uh-huh.
10    Q. Do you have the closing documents from the
11  various sales that you have closed through Premier
12  Builders since 2013?
13    A. I do have them.
14    Q. Are they maintained with the cost documents
15  related to the construction of the homes?
16    A. Yes.
17    Q. With regard to contracts relating to the sales
18  of properties, you produced the one contract between
19  Travis Young d/b/a Premier Builders and Jesus and
20  Rebecca Reza. Have you produced some more?
21    A. This is the Silver Star one. And then I
22  didn't know if you needed hers or not.
23    Q. With regard to the Silver Star contract that
24  you have handed me, who prepared the original of this
25  contract?

## Page 41

1    A. The other party, Sandy Messer organized it.
2    Q. What title company did you use to close this?
3    A. That one was Lone Star.
4    Q. Can you remember who the closer was on the
5  deal?
6    A. Yes. It's Tim Wieland.
7    Q. With regard to the financial statements that
8  you have produced, can you tell me what it is that these
9  three documents represent -- or these three groups of
10  documents that you have provided to me that relate to
11  financial statements?
12    A. This was my cost breakdown per job, and then,
13  I mean, I guess I had a simple way of accounting. And
14  so just the final costs, what the total build costs were
15  and then what I sold it for.
16    Q. And these are basically the job summaries or
17  the cost accounting on 448 San Clemente, Montoya Oak and
18  Silver Star?
19    A. Right.
20    Q. Is that right?
21    A. Uh-huh.
22    Q. Did you ever prepare a financial statement for
23  Premier Builders that included assets, liabilities and
24  owner's equity?
25    A. No, I never did.

## Page 42

1    Q. Did you ever have an accountant do that for
2  you?
3    A. No.
4    Q. Did Premier Builders ever own any personal
5  property?
6    A. As far as --
7    Q. Tools.
8    A. I did give you my tool inventory. I never
9  really had many tools, but I guess my truck would be the
10  only thing, if that's -- well --
11    (Exhibit marked, 2.)
12    Q. (BY MR. HAUGLAND) Why don't we go ahead and
13  mark this -- we have got Exhibit 1, so let's go to
14  Exhibit 2, because this is kind of --
15    A. The vehicle mileage were on there.
16    Q. That's the Premier Builders Inventory List
17  that you prepared and provided to me today?
18    A. Correct.
19    Q. And what all do you have on there?
20    A. It's just --
21    MR. NEVAREZ: Do you have another copy of
22  that for me?
23    MR. HAUGLAND: He brought this.
24    MR. NEVAREZ: Yes, I know. Since you
25  entered it into an exhibit, I would like to have a copy.

## Page 43

1    MR. HAUGLAND: Well, I mean, can we wait
2  till we ask questions about it and make a copy on the
3  break?
4    MR. NEVAREZ: Well, I kind of would like
5  to follow along. I can't see from here.
6    MR. HAUGLAND: Well, your client brought
7  it. If you want to break so we can make a copy of it
8  before I ask questions, I guess we can.
9    MR. NEVAREZ: Well, go ahead, since it's
10  just a small document. Are there going to be other
11  documents that you are going to be entering into
12  exhibits?
13    MR. HAUGLAND: The ones that I brought
14  with me I have extra copies for you. I'm not planning
15  on necessarily making exhibits of all the documents at
16  this point. But this one I didn't -- since it's a
17  single page, I was afraid it was going to get lost.
18    MR. NEVAREZ: Okay. Go ahead.
19    Q. (BY MR. HAUGLAND) What all did you include as
20  business assets of Premier Builders?
21    A. Just some small value tools and my truck, and
22  then I just put the vehicle mileage on the sheet.
23    Q. You also have an "Audi Q5 Milage." Who does
24  the Audi belong to?
25    A. That's my wife's.

## Page 44

1    Q. And what's the Infinity G37?
2    A. That's hers, too. I mean her car.
3    Q. And so the 2008 F-250, is that your car?
4    A. Uh-huh.
5    Q. Do you have any other vehicles that you and
6  your wife own?
7    A. No.
8    Q. With regard to documents related to financing
9  of your business, would it be fair to say that these two
10  Uniform Residential Loan Application groups of documents
11  represent the totality of the loan documentation in your
12  possession relating to Premier Builders?
13    A. Yes, it is.
14    Q. What two jobs did these relate to, if you can
15  tell me?
16    A. They were both for Silver Star. Yes, they
17  were both for Silver Star.
18    Q. And who was the lender?
19    A. The broker was Marquise Lending. The actual
20  lender was Jet Private Loans.
21    Q. Do you know the person behind Jet Private
22  Loans?
23    A. No, I don't. I never met him.
24    Q. Did you ever make a loan application to Binary
25  Investments?

## Page 45

1    A. Yes. Actually one of those was, I think, an
2  application. It didn't go through. I mean, we never
3  consummated the deal. But the Jet loan did.
4    Q. Why didn't the Binary Investments loan go
5  through?
6    A. Right when I was doing that loan, that's when
7  I sold the property.
8    Q. Is that the Silver Star property?
9    A. Yes.
10    Q. How much were you going to borrow from Binary?
11    A. It was 350-. It was mainly to pay off the Jet
12  loans.
13    Q. Was there more than one Jet loan?
14    A. There were two Jet loans on the Silver Star
15  for 250-.
16    Q. What was going to be done with the extra
17  $100,000 you were borrowing from Binary?
18    A. Well, at that time I still -- finishing the
19  house, so I was going to use it for construction. But I
20  had still owed money to Jet loans. I don't remember
21  exactly how much. So it wasn't going to come out to
22  that much that they were going to end up giving out of
23  that 350-.
24    Q. We were talking about cars and trucks. Do the
25  LLCs that are owned by your wife own any cars or trucks?

## Page 46

1    A. No.

2    Q. The cars and truck titles, are those what you

3  brought me here today?

4    A. Yes. That one is my Ford, and then that one

5  in the Infinity.

6    Q. Do you not have the title for the Audi Q5?

7    A. No, because that one is financed. The

8  Infinity was totaled and we bought it back and I

9  repaired it.

10    Q. What other documents have you produced today?

11    A. Just insurance documents of the vehicles.

12    Q. Have you produced your homeowner's insurance

13  policy?

14    A. No. I need to ask Kathleen Hernandez what's

15  on it right now.

16    Q. Who did you buy the insurance for your

17  homeowner's through?

18    A. I never purchased it. She said she has just

19  had the same insurance on the property since -- it's

20  been a while now, six years. So I need to find out.

21    Q. So who has the insurance?

22    A. I believe it's still in her name through

23  her -- that her lender makes her have, the Colonial

24  Savings.

25    Q. That's Kathryn [sic] Hernandez?

## Page 47

1    A. Uh-huh.

2    Q. She is your lender?

3    A. Right.

4    Q. She was the seller, and she let you wrap her

5  original mortgage?

6    A. Correct.

7    Q. Other than your Texas driver's license, do you

8  have any other licenses?

9    A. No, I don't.

10    Q. Do you have any memberships in any other

11  organizations or associations?

12    A. No.

13    Q. During the last four years, have you or your

14  wife spent more than $500 in acquiring any personal

15  property?

16    A. The only ones I can think of is a new bed, new

17  mattress. I really didn't buy many items, nor did she.

18    Q. Who did you buy the bed and mattress from?

19    A. Mattress firm, I think. I'm not sure.

20    Q. Would you have spent more than $500 in any one

21  expenditure with Amazon.com?

22    A. A lot of times the Amazon was for building

23  supplies.

24    Q. What monthly credit cards -- strike that.

25    What cards have you used over the last

## Page 48

1  four years?

2    A. The Chase business one -- Chase, Inc., I mean.

3  There was a Capital One. The Capital One was a business

4  one. And there was a Bank of America personal, and the

5  Citi card that was -- well, the City card was business

6  too.

7    Q. So --

8    A. And a Chase -- there's another Chase

9  Southwest.

10    Q. So you have a Chase -- what -- MasterCard?

11    A. It was Chase, Inc. Visa. Yes, it was a Visa.

12    Q. And then you have a Capital One?

13    A. Uh-huh. Yes.

14    Q. And you have a Citi card?

15    A. Yes.

16    Q. And you have a Chase Southwest?

17    A. Yes.

18    Q. You did not produce those statements. Do you

19  have access to those statements?

20    A. I could probably get them. Since they were

21  closed, I don't know how difficult that is.

22    Q. You didn't keep the statements?

23    A. I do have some of them.

24    Q. I would still like to see them.

25    A. Like I said, the main one I used was the

## Page 49

1  Chase, Inc. card. Of course, because I was getting

2  points at that time. But it was a paid-in-full-monthly

3  card.

4    Q. So is it fair to say that none of the

5  agreements between you and your father have ever been in

6  writing?

7    A. Correct.

8    Q. And I asked you to provide the checking

9  account statements for your wife. Why have you not

10  produced those today or yesterday?

11    A. The same reason, just because it was her

12  separate property.

13    Q. I asked you to produce all form 940's and form

14  941's prepared for Premier Builders. And I think you

15  indicated yesterday you have never prepared those; is

16  that right?

17    A. Correct.

18    Q. And that's because you have never had any

19  employees?

20    A. Right.

21    Q. Do either of the LLCs that you are currently

22  working for have any employees besides yourself?

23    A. No.

24    Q. I asked you to produce your wife's Texas

25  driver's license and Social Security card. You have not

## Page 50

1 done that, have you?
2     A. No.
3     Q. Why not?
4     A. Mainly a privacy thing, too.
5     Q. Does she have a Texas driver's license or a
6 New Mexico driver's license?
7     A. I don't know. I think she switched it to
8 Texas.
9     Q. And you have indicated that your homeowner's
10 insurance policy -- you don't have a copy of it?
11     A. No. I need to do some research into that.
12     Q. Do the LLCs that you are currently working for
13 have any property or inventory from which they work?
14     A. Do they have any property? Please repeat.
15     Q. Let me rephrase. Does the LLC own any tools?
16     A. No.
17     Q. Does the LLC own any equipment?
18     A. Not that I'm aware of.
19     Q. Have you ever received a rendition form and a
20 request from the El Paso Central Appraisal District to
21 submit a rendition of any personal property used in the
22 operation of Premier Builders?
23     A. I have never received one.
24     Q. Have you ever provided one?
25     A. No, I never have.

## Page 51

1     Q. Have you produced any of the books and records
2 of Premier Builders & Design, LLC?
3     A. No.
4     Q. Why not?
5     A. Since that's all the LLC questions -- since
6 it's my wife's company.
7     Q. Have you produced any of the documents
8 relating to RUF Developers, LLC or RUF, LLC?
9     A. The same, since it's my wife's company.
10     Q. What's the legal name of that entity, if you
11 know?
12     A. Of which one?
13     Q. RUF, R-U-F.
14     A. It's RUF Developers.
15     Q. You indicated that RUF does own a lot,
16 correct?
17     A. Yes.
18     Q. Who was that lot acquired from?
19     A. It was acquired from High Mountain, Limited.
20     Q. That's the one -- is that the one where
21 financing was provided?
22     A. Well, both of them. So the Premier Builders &
23 Design and the RUF Developers.
24     Q. So was the consideration of the promissory
25 note and deed of trust that Premier Builders is

## Page 52

1 obligated to repay?
2     A. Not on RUF developers.
3     Q. So it has a separate note --
4     A. Yes.
5     Q. -- and deed of trust?
6     A. Uh-huh.
7     Q. You were asked to provide the itemized list of
8 items purchased to build or renovate 724 Montoya Oak
9 Lane. Is that the financial statement that you provided
10 to me --
11     A. Yes.
12     Q. -- that we discussed earlier?
13     And the 356 Silver Star you likewise
14 produced for me?
15     A. Correct.
16     Q. You haven't done that for the Las Cruces
17 property that was acquired from Ms. Snow, have you?
18     A. No, since that was the LLC's, my wife's.
19     Q. And likewise, you haven't produced the costs
20 related to 354 Rocky Point, correct?
21     A. Correct.
22     Q. And that's because it's an LLC property?
23     A. Uh-huh.
24     Q. Is this a yes?
25     A. Yes.

## Page 53

1     Q. You were asked to produce a copy of the
2 certificate of completion and payment plan developed
3 with the credit counseling agency identified in your
4 original bankruptcy filing.
5     Is this the certificate of counseling
6 that you have produced here today?
7     A. Correct. And I asked Cheryl, and she said
8 since -- something about since I was upside-down there
9 was no payment plan.
10     Q. You indicated -- are you still paying for the
11 truck that you are driving?
12     A. No.
13     Q. Does your wife have a retirement account?
14     A. I mean, she does have a retirement account.
15     Q. And you have not produced the statements
16 related to the retirement account, correct?
17     A. Correct.
18     Q. Other than the loan applications that you have
19 provided, you have not provided any loan documents
20 related to the lots acquired by Premier Builders &
21 Design, LLC or by RUF Developers, LLC, correct?
22     A. Correct.
23     Q. And you have not done that because you contend
24 that they are your wife's separate property; is that
25 right?

Page 54

1      A. Correct.
2      Q. The accountings that you have provided on the
3  construction of the homes for Premier Builders, would
4  there be receipts in there for the materials that were
5  purchased related to those properties?
6      A. Uh-huh. Yes. Or -- physical receipts --
7      Q. Yes.
8      A. -- you mean on the --
9      Q. Is there backup to the financial information
10 provided for those home constructions?
11     A. I mean, the main backup is -- pretty much
12 everything ran through my bank account, so I would use
13 that. I mean, I do have a lot of receipts.
14     Q. Are you on any medications today?
15     A. Huh-uh.
16     Q. Is that a no?
17     A. Oh, yes. No.
18     Q. Have you ever been in the military?
19     A. No.
20     Q. Have you ever been convicted of a crime?
21     A. No.
22     Q. Have you ever been arrested?
23     A. I won't answer that.
24     Q. What now?
25     A. I can't answer that.

Page 55

1      Q. You can't answer that, or you won't answer
2  that?
3      A. No, I won't answer it.
4      Q. Have you ever been fired from a job for cause?
5      A. No.
6          (Exhibit marked, 3.)
7      Q. (BY MR. HAUGLAND) Let me hand you what's been
8  marked Exhibit 3 for identification. And I'll represent
9  to you that this is a copy of page 1 through 51 of your
10 initial bankruptcy filing, including the voluntary
11 petition and your schedules.
12         Do you recognize these documents?
13     A. Yes.
14     Q. Were these documents true and correct and
15 complete as of February 3, 2017?
16     A. Yes.
17         (Exhibit marked, 4.)
18     Q. (BY MR. HAUGLAND) Let me hand you what's been
19 marked Exhibit 4 for identification. Do you recognize
20 that document?
21     A. Yes.
22     Q. These are the Statement of Financial Affairs
23 that you filed along with the petition and schedules
24 when you filed for bankruptcy, correct?
25     A. Yes.

Page 56

1      Q. And to the best of your knowledge, were those
2  documents true and correct and accurate as of the date
3  of filing on February 3, 2017?
4      A. Yes.
5          (Exhibit marked, 5.)
6      Q. (BY MR. HAUGLAND) Let me hand you what's been
7  marked Exhibit 5 for identification. These are amended
8  Statement of Financial Affairs that I believe you filed
9  in your bankruptcy on March 21, 2017.
10         Do you recognize these documents as that?
11     A. Yes.
12     Q. And what did you change from your original
13 Statement of Financial Affairs to your amended Statement
14 of Financial Affairs?
15     A. I had forgot that I did the Jet Private Loan
16 financial statement for them.
17     Q. When you filed for bankruptcy, you indicated
18 that you were receiving $3,000 a month in income.
19     A. Correct.
20     Q. From what source?
21     A. From my parents.
22     Q. Have you had any other source of income in
23 2017?
24     A. No.
25     Q. Are your parents continuing to provide you

Page 57

1  with $3,000 per month?
2      A. Yes.
3      Q. The Audi Q5, you indicated it was in your
4  wife's name only?
5      A. Yes.
6      Q. Are you making the payments on that loan?
7      A. I mean -- yes, she is.
8      Q. She is or you are?
9      A. I mean she is.
10     Q. When you closed on 356 Silver Star, who was
11 the seller of that property?
12     A. My d/b/a was.
13     Q. Did Premier Builders, LLC have anything to do
14 with that closing?
15     A. No. I don't think it was even formed yet at
16 that time.
17     Q. 356 Silver Star was sold for $675,000; is that
18 right?
19     A. Correct.
20     Q. And how much profit did you make off the
21 Silver Star sale?
22     A. It's what I had in there. I mean, before
23 going through the taxes of 2016, it was like 10,000, I
24 believe.
25     Q. Whose bank account were the sales proceeds

## Page 58

1  from Silver Star deposited into?
2      A.  It was deposited into my account, then I
3  transferred it to my father.
4      Q.  And the account that the sales proceeds were
5  deposited in, would that be the account that you
6  provided me the statements for?
7      A.  Correct.  It's the 8381.
8      Q.  On your loan application with Binary
9  Investments you stated your monthly gross income was
10  $9,000.  What did you base that on?
11      A.  When I did those loans I was just
12  projecting -- I was projecting to sell Montoya and
13  Silver Star in the same year, and for much more
14  anticipated profits.  That didn't happen.
15          Are you asking on the Binary one?
16      Q.  Yes.
17      A.  Yes.  The same thing.  And the loan officer
18  said, Yes, just do your projected income for the
19  upcoming year.
20      Q.  Are you continuing to get family assistance
21  after filing this bankruptcy petition?
22      A.  Yes.
23      Q.  Does your wife have a general contractor's
24  license?
25      A.  Yes.

## Page 59

1      Q.  Why?
2      A.  Well, the LLC has the general contractor
3  license.
4      Q.  Why?
5      A.  Why does she have one?
6      Q.  Yes, sir.  Why does she have one?
7      A.  In order to pull permits with the City.
8      Q.  Does she have to have a license because you
9  don't?
10      A.  I mean --
11          MR. NEVAREZ:  I mean, I think that's
12  really just speculation as to why she has to have a
13  license because he doesn't.
14      A.  I mean anybody could have a license.  You can
15  go down to the City and pay $100.
16      Q.  (BY MR. HAUGLAND)  Is your general contractor's
17  license on hold with the City?
18      A.  Yes, it is.
19      Q.  Why?
20      A.  Because of your client.
21      Q.  She is able to stop a license from being
22  issued?
23      A.  Uh-huh.
24      Q.  How?
25      A.  By nonstop calling the City and complaining

## Page 60

1  until they take initiative and falsely put it on hold
2  that way.
3      Q.  City inspectors looked at my client's house
4  and found multiple problems with it.  Hasn't the City?
5      A.  I believe that -- I mean, I wouldn't say they
6  found the problems, but they went and inspected it.
7      Q.  They didn't find anything wrong with it after
8  they inspected it?
9      A.  Ron Roth told me what to do to get my license
10  off, and I did it, and then he went back on his word.
11  And not much I can do.
12      Q.  Prior to pulling the license for her LLC, did
13  your wife have any construction experience?
14      A.  I mean, if you look at most builders, a lot of
15  them don't have experience, you will come to learn.  I'm
16  not saying she does or doesn't have experience.
17      Q.  In order for your wife to open Premier
18  Builders & Design, LLC, did you have to give her
19  permission to use the name Premier Builders after you
20  had used it for several years?
21      A.  No, I didn't, since mine was just a sole
22  proprietor, since that's an LLC.
23      Q.  So she didn't ask for your permission to use
24  Premier Builders as the name of her LLC?
25      A.  Huh-uh.

## Page 61

1      Q.  Is that a no?
2      A.  Oh, no.
3      Q.  And so I understand, the first project that
4  Premier Builders did was the remodel of the Las Cruces
5  property, correct?
6      A.  Correct.
7      Q.  And the second project of Premier Builders &
8  Design, LLC is to build the house at Rocky Point?
9      A.  Correct.
10      Q.  And that price is listed for sale for how
11  much?
12      A.  898,000.
13      Q.  And the financing for the Rocky Point house
14  has been provided by your father, Keith Young?
15      A.  Correct.
16      Q.  And there is a note and deed of trust on that
17  loan?
18      A.  Correct.
19      Q.  Have you had to sign that note or deed of
20  trust?
21      A.  No.  I'm not allowed to.
22      Q.  Has your wife signed a personal guarantee on
23  that loan?
24      A.  No, she hasn't.
25      Q.  Why did your wife create RUF Developers, LLC

Page 62

1   if she already had an LLC, Premier Builders?
2       A.  Just to have it under a separate holding.  It
3   was under the advice of Mr. Kirk.
4       Q.  Other than the two lots and the house that are
5   owned by your wife's LLCs, does it have any other
6   assets, to your knowledge?
7       A.  No, it doesn't.
8           MR. HAUGLAND:  Let's take a break.
9           (A break taken, 12:41 to 12:54.)
10      Q.  (BY MR. HAUGLAND)  Mr. Young, when you were
11  doing business as Premier Builders, did you send form
12  1099's to all your subcontractors?
13      A.  Yes, I did.
14      Q.  Were those form 1099's accurate?
15      A.  They should be.
16      Q.  Did you ever overstate in a 1099 any amounts
17  paid to subcontractors?
18      A.  I don't believe so.
19      Q.  How long have you been getting $3,000 a month
20  in family assistance?
21      A.  My father had been helping me for quite a
22  while because he can't stand what she did to me and this
23  whole situation.
24      Q.  Would he give you that $3,000 in a check or in
25  cash?

Page 63

1       A.  It would be different, different each time.
2   Just -- I mean recently it's been 3,000.  It was
3   different in the past, different amounts.
4       Q.  Would you deposit it in your checking account?
5       A.  Sometimes.
6       Q.  Which checking account?
7       A.  Well, I mean, it would always be in 8381.
8       Q.  Is that your personal account or is that the
9   d/b/a account?
10      A.  The d/b/a.
11      Q.  In 2015 why were you making payments to
12  Escrow, Inc.?
13      A.  That was the Jet loan.  They use Escrow as
14  their agent -- I mean their -- to manage it, the
15  payments.
16      Q.  Who is George Rosales?
17      A.  He was one of my subcontractors.
18      Q.  Did he have a business name?
19      A.  No.  Most of those guys don't.
20      Q.  Which car did Bank of America finance?
21      A.  It was my F-250.
22      Q.  What financing did you have at FirstLight
23  Federal Credit Union?
24      A.  FirstLight?  I'm not sure.  I never had
25  financing there.

Page 64

1           (Exhibit marked, 6.)
2       Q.  (BY MR. HAUGLAND)  Can you tell me what
3   Exhibit 6 is?
4           MR. NEVAREZ:  Let me see it.
5       A.  It was a car payment.
6       Q.  (BY MR. HAUGLAND)  For what car?
7       A.  It was my wife's.
8           (Exhibit marked, 7.)
9       Q.  (BY MR. HAUGLAND)  Let me hand you what's been
10  marked Exhibit 7.  What's that?
11      A.  Same thing.
12      Q.  It's a car payment that you made for your
13  wife?
14      A.  Yes, at that time.
15          (Exhibit marked, 8.)
16      Q.  (BY MR. HAUGLAND)  Let me hand you what's been
17  marked as Exhibit 8 for identification.  Can you tell me
18  what that is?
19      A.  That's for the Infinity car.
20      Q.  Who is Letty Mata?
21      A.  Letty Mata?  Oh, she is a drafter.
22      Q.  What plans has she drafted for you?
23      A.  She has done Silver Star.  She has done some
24  concept ones for me, too.  She did -- I think she did
25  hers (indicating).  Oh, no, no.  That was Rafcad.  She

Page 65

1   did Silver Star, and then she has just done some concept
2   drawings, too.
3       Q.  Who did the plans for 356 Rocky Point?
4       A.  Mata did.  No, that wasn't Mata.  I had the
5   architect.  What was his name?  Ed McCormick.
6       Q.  Ed McCormick?
7       A.  Uh-huh.
8       Q.  What checking account do you use since
9   September of 2016?
10      A.  That was my only one that I was using.  Oh,
11  since September?
12      Q.  Yes.
13      A.  I haven't really written any more checks since
14  then.
15      Q.  Have you understood my questions here today?
16      A.  Yes.
17      Q.  Are there any answers to any of my questions
18  that you would like to change at this point?
19      A.  No.
20          MR. HAUGLAND:  Thank you, sir, for
21  appearing here today.  I'll pass the witness.
22          MR. NEVAREZ:  I have no questions.
23          (Deposition concluded at 1:06 p.m.)
24
25

Page 66

CERTIFICATE

STATE OF TEXAS      )
COUNTY OF EL PASO  )

1. I, Mary Procell, Certified Shorthand Reporter of the State of Texas, hereby certify that this transcription is a true record of the testimony given in said proceedings, and that said transcription is done to the best of my ability.

Given under my hand and seal of office on this 14th day of April, 2017.

*Mary Procell*
MARY PROCELL
Certified Shorthand Reporter
Of the State of Texas
Certificate Number 2812
Date of Expiration of
Certificate: 12/31/18
Firm Registration Number: 372

---

Page 67

CHANGES AND SIGNATURE
TRAVIS RYAN YOUNG         APRIL 4, 2017
PAGE LINE CHANGE          REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

---

Page 68

I, TRAVIS RYAN YOUNG, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

TRAVIS RYAN YOUNG

THE STATE OF _____)
COUNTY OF _____)

Before me, _____, on this day personally appeared TRAVIS RYAN YOUNG, known to me (or proved to me under oath or through _____) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2017.

NOTARY PUBLIC IN AND FOR
EL PASO COUNTY, TEXAS
MY COMMISSION EXPIRES _____

---



**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: June 15, 2017.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| TRAVIS RYAN YOUNG, | § | Case No. 17-30163-hcm |
| | § | |
| Debtor. | § | |

### AGREED ORDER RESOLVING MOTION TO COMPEL AND FOR SANCTIONS PURSUANT TO RULE 2004

On May 24, 2017, came on for hearing the Motion to Compel and for Sanctions Pursuant to Rule 2004 [Doc #12] (the "Motion") filed by Creditor Pam Young, and the Debtor's Response to Motion to Compel and for Sanctions Pursuant to Rule 2004 [Doc # 19] (the "Response"). On May 5, 2017, Creditor filed an Original Complaint For Determination of Dischargeability of Debt, docketed as Adversary Proceeding Case No. 17-03009, and an Original Complaint Objecting to Discharge of Debtor, docketed as Adversary Proceeding Case No. 17-03010.

Movant, Creditor Pam Young appeared in person and through her attorney, Corey W. Haugland. Travis Young appeared in person and by and through his attorney Michael R. Nevarez. Counsel for the parties announced an agreement on the record, which the Court is memorializing in this Order, which agreement is hereby approved.



**EXHIBIT**

P-2

The Court has considered the Motion, the Response, the 2004 Notice, the two Adversary Proceedings, the record, and the statements and arguments of counsel. For the reasons stated by the Court on the record at the hearing, the Court finds that the Motion should be granted in part, denied in part, and that the following Order should be entered with respect to the Motion.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

1.      The Motion to Compel and for Sanctions Pursuant to Rule 2004 is hereby granted in part and denied in part.

2.      Under Bankruptcy Rule 2004, the Debtor is not required to produce to Creditor Pam Young documents that are not in the possession of the Debtor, including documents concerning the Debtor's pre-petition banks and/or credit card companies. Creditor may obtain said records via a subpoena duces tecum and the Debtor will not object to said discovery.

3.      Under Bankruptcy Rule 2004, the Debtor is not required to produce documents to Creditor Pam Young that relate to Brittany Young, the Debtor's wife, and her businesses. Creditor may obtain said records via a subpoena duces tecum and the Debtor will not object to said discovery.

4.      By agreement of counsel, the Debtor is not required to produce the documents requested by counsel for Creditor Pam Young, in the following paragraphs of Exhibit 4 of the Motion: Paragraphs (a), (b)2-6, (c), (d), (e)1, (f), (g), (h), (i), (j), (k)1-2, (m)5, (n), (p), (r), (s), (t), (v), (w), (x), (y), (z), (aa) – (xx), and (aaa) – (bbb), as part of the Rule 2004 Examination. Nothing in this Order precludes Creditor Pamela Young from seeking such documents from the Debtor, or any third party, in Adversary No. 17-03009-hcm or Adversary No. 17-03010-hcm.

5.      By agreement of counsel, the Debtor is only required to produce to counsel for Creditor Pam Young, within fourteen (14) from the date that this Order is filed with the U.S.

Bankruptcy Clerk, the following documents and/or information requested in the following paragraphs of Exhibit 4 of the Motion: Paragraphs:

(b)1)   The July, 2016 through January, 2017 bank statements and checks for the Debtor's Bank of America business account;

(e)2)   The Debtor's federal income tax return for 2016 and all Form 1099s sent to subcontractors who worked for the Debtor on his construction projects from January 1, 2013 through January 31,2017;

(k)   All job files concerning the Debtor's pre-petition construction from January 1, 2013 through January 31, 2017, including closing documents, HUD-1s, receipts, expense records, credit card receipts, and related records;

(m)   The invoices for the following expenditures:

   1)   Ashley Furniture - $1,127.00;
   2)   MPS-EP-Moto - $2,810.00
   3)   Adiamor wedding ring - $1,430.00;
   4)   Mattress Plus - $1,999.00.

(o)   All documents relating to the bills and/or purchase price for items which the Debtor has claimed to be exempt property and related records concerning the acquisition of same;

(q)   In lieu of the actual credit card statements, a list of all credit card companies and account numbers for all credit cards used by the Debtor from January 1,2013 through January 31, 2017.

(w)1)   The invoices and plans received from Letty Mata that correspond to the

$3,620.00 of payments made by the Debtor to Ms. Mata from February to

May, 2016;

(zz)    To the extent not previously produced, all titles, insurance policies, and

retail installment contracts related to any of the automobiles in which the

Debtor has an interest, including the 2008 Ford F-250, the 2013 Infinity,

and the 2012 Audi Q-5;

6.      Any relief requested in the Motion that is not expressly granted in this Order is

hereby denied.

###

AGREED AS TO CONTENT AND FORM:

/s/Michael R. Nevarez
Michael R. Nevarez
State Bar No. 14933400
The Nevarez Law Firm, PC
P.O. Box 12247
El Paso, Texas 79913
E-Mail: **MNevarez@LawOfficesMRN.com**
Attorney for Debtor TRAVIS RYAN YOUNG


/s/Corey W. Haugland
Corey W. Haugland
State Bar No. 09234200
JAMES & HAUGLAND, P.c.
609 Montana Avenue
El Paso, Texas 79902
E-Mail: chaugland@jghpc.com
Attorney for PAM YOUNG



**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: December 12, 2017.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TRAVIS RYAN YOUNG | § | Case No. 17-30163-HCM |
| Debtor. | § | |

---

### ORDER REGARDING SECOND MOTION TO
### COMPEL, CIVIL CONTEMPT, AND SANCTIONS (TRAVIS YOUNG)

On December 12, 2017, the Court conducted a hearing on the Second Motion to Compel, for Order of Civil Contempt, and for Sanctions Against Travis Ryan Young ("Second Motion")(dkt# 45) filed by Pamela Young ("Creditor"). Mr. Travis Young ("Debtor") and Mr. Carlos Miranda, as counsel for Debtor, appeared at the hearing. Mr. Corey Haugland, as counsel for Creditor, also appeared at the hearing.

Through the Second Motion, Creditor seeks to compel Debtor to produce certain documents required by the Agreed Order Resolving Motion to Compel and for Sanctions Pursuant to Rule 2004 entered by the Court on June 15, 2017 ("Prior Order")(dkt# 32). The Prior Order required Debtor to produce certain documents to Creditor by June 29, 2017. Creditor also seeks to hold Defendant in civil contempt and sanctions for non-compliance with the Prior Order, including denial of Debtor's discharge under 11 U.S.C. § 727(a)(6)(A). The Court has considered the Second Motion, the Prior Order, and the statements and arguments of counsel. The Court finds that the following Order should be entered on the Second Motion.



**EXHIBIT**

**P-3**

1

**IT IS THERFORE ORDERED AND NOTICE IS HEREBY GIVEN AS FOLLOWS:**

1.   The Second Motion to Compel, for Order of Civil Contempt, and for Sanctions Against Travis Ryan Young ("Motion")(dkt# 45) filed by Pamela Young ("Creditor") is hereby GRANTED to the extent set forth below.

2.   By December 27, 2017, Mr. Travis Young shall produce for inspection and photocopying to Creditor's counsel, all documents required by paragraph 5 of the Agreed Order Resolving Motion to Compel and for Sanctions Pursuant to Rule 2004 entered by the Court on June 15, 2017 ("Prior Order")(dkt# 32) which are within Mr. Travis Young's possession, custody, or control.

3.   By December 29, 2017, Mr. Travis Young shall also provide Plaintiff's counsel with a sworn written Response which shall set forth by each category of documents required to be produced by paragraph 5 of the Prior Order: (a) the responsive documents actually produced by Mr. Travis Young to Creditor's counsel; and (b) which requested documents could not be produced to Creditor's counsel because the documents do not exist. Mr. Travis Young may not respond to paragraph 5 of the Prior Order by stating that the documents have been or will be produced by some other person.

4.   Mr. Travis Young has not complied with the Prior Order of the Court requiring Mr. Travis Young to produce documents. As a result, by December 27, 2017, Mr. Travis Young shall pay $2,500 in attorney's fees and expenses to Creditor's counsel, representing reasonable fees and expenses in filing and presenting the Second Motion to compel compliance with the Prior Order of the Court.

5.   If by December 27, 2017, Mr. Travis Young fails to produce the documents required by this Order, or if by December 29, 2017, Mr. Travis Young fails to provide the sworn Response required by this Order, then Mr. Travis Young will be in civil contempt of Court. In such event, Creditor will also be entitled to seek additional and further relief and sanctions from the Court against Mr. Travis Young, including without limitation, denial of Mr. Travis Young's bankruptcy discharge under 11 U.S.C. § 727(a)(6)(A).

6.   Mr. Carlos Miranda, as counsel for Mr. Travis Young, shall cause a copy of this Order to be served upon Mr. Travis Young.

7.   Any relief requested in the Motion which is not expressly granted in this Order is hereby DENIED without prejudice.

# # #

2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **TRAVIS YOUNG,** | ) | |
| | ) | |
| Debtor. | ) | **Bankruptcy Case No. 17-30163-HCM** |
| | ) | **Chapter 7** |
| _____ | ) | |
| | ) | |
| **PAMELA YOUNG,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adversary Case No. 17-03009** |
| | ) | |
| **TRAVIS YOUNG, Individually and** | ) | |
| **d/b/a PREMIER BUILDERS,** | ) | |
| | ) | |
| Defendant. | ) | |

## TRAVIS YOUNG'S SWORN RESPONSES TO PLAINTIFF'S FIRST AND SECOND REQUESTS FOR PRODUCTION

COMES NOW Travis Young, Defendant herein, through his attorneys of record MIRANDA & MALDONADO, P.C., and hereby submits the following *Sworn Responses to Plaintiff's First and Second Requests for Production*:

**REQUEST FOR PRODUCTION NO. 1:**

Your job file for the Property. That includes all invoices related to the construction. That includes all subcontracts related to the construction. That includes all closing documents, including the HUD-1 from the closing on the sale of the Property to Plaintiff.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**REQUEST FOR PRODUCTION NO. 2:**

All documents relating to federal and state income tax returns specifically including the Form W-2s, Form 1099s, schedules and worksheets thereof and all other papers, and memoranda referring to any adjustment made in connection therewith for the previous four (4) years (2013, 2014, 2015, and 2016). This also includes the invoices and bills which support the business expenses claimed in your tax returns.

EXHIBIT

P-4

**RESPONSE: See attached for what is in my possession, custody, or control.**

**REQUEST FOR PRODUCTION NO. 3:**

All documents relating to monies received and being presently received by you from any family member, including but not limited to salaries, wages, earnings, draws, loans, family assistance, gifts, monetary gifts, or reimbursed expenses since January 1, 2013.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**REQUEST FOR PRODUCTION NO. 4:**

All documents relating to any agreement with your wife, Brittany Young, concerning marital property, separate property or the division of your income or assets during your marriage.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO. 5:**

Your homeowner's insurance policy including all riders for the years 2015 and 2016.

**RESPONSE: None for 2015. None for 2016.**

**REQUEST FOR PRODUCTION NO. 6:**

The diploma received by Travis Young from New Mexico State University reflecting his degree.

**RESPONSE: Please see attached.**

**REQUEST FOR PRODUCTION NO. 7:**

Produce all documents which support your affirmative defense of accord and satisfaction.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 8:**

Produce all documents which support your affirmative defense of ambiguity.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 9:**

Produce all documents which support your affirmative defense of no liability for attorney's fees.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 10:**

Produce all documents which support your affirmative defense of illegality.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 11:**

Produce all documents which support your affirmative defense of impossibility of performance.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 12:**

Produce all documents which support your affirmative defense of laches.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 13:**

Produce all documents which support your affirmative defense of lack of mutuality.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 14:**

Produce all documents which support your affirmative defense of lack or failure of consideration.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 15:**

Produce all documents which support your affirmative defense of lack of privity.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 16:**

Produce all documents which support your affirmative defense of no meeting of the minds.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 17:**

Produce all documents which support your affirmative defense of failure to mitigate.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 18:**

Produce all documents which support your affirmative defense of modification.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 19:**

Produce all documents which support your affirmative defense of mutual mistake.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 20:**

Produce all documents which support your affirmative defense of novation.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 21:**

Produce all documents which support your affirmative defense of offset.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 22:**

Produce all documents which support your affirmative defense of ratification.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 23:**

Produce all documents which support your affirmative defense of rejection.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 24:**

Produce all documents which support your affirmative defense of repudiation.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 25:**

Produce all documents which support your affirmative defense of rescission.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 26:**

Produce all documents which support your affirmative defense of responsibility.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 27:**

Produce all documents which support your affirmative defense of statute of frauds.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 28:**

Produce all documents which support your affirmative defense of unconscionability.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 29:**

Produce all documents which support your affirmative defense of unilateral mistake of fact.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 30:**

Produce all documents which support your affirmative defense of variance and deficiency.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 31:**

Produce all documents which support your affirmative defense of void as against public policy.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 32:**

Produce all documents which support your affirmative defense of waiver and estoppel.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 33:**

Produce all documents which support your affirmative defense of waiver of breach.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 34:**

Produce all documents which support your affirmative defense of waiver of performance.

**RESPONSE: No response necessary at this time.**

**REQUEST FOR PRODUCTION NO. 35:**

Produce all documents relied upon by you to provide any answer or other response to any *Interrogatory* propounded to you by Plaintiff.

**RESPONSE: To be supplemented.**

**REQUEST FOR PRODUCTION NO. 36:**

Produce each and every document identified in your answers to *Interrogatories*.

**RESPONSE: To be supplemented.**

**REQUEST FOR PRODUCTION NO. 37:**

Produce a copy of all written communications by you with your insurance agent(s) concerning the Property or concerning any insurance acquired by you since January 1, 2013.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO. 38:**

Produce all written communications between you and any subcontractor who assisted you with the construction of the Property.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**REQUEST FOR PRODUCTION NO. 39:**

Produce a copy of any written communications between you and any witness or expert witness identified by Plaintiff in her Initial Disclosures provided to you in this case. This includes all

written communications by your attorney on your behalf with any witnesses or expert witnesses identified by Plaintiff in her Initial Disclosures provided in this case.

**RESPONSE: To be supplemented.**

**REQUEST FOR PRODUCTION NO. 40:**

Produce a copy of your engagement letter or engagement agreement with your attorney in this adversary proceeding.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**REQUEST FOR PRODUCTION NO. 41:**

Produce a copy of all billing statements received by you from your attorney who is providing representation to you in this adversary proceeding.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**REQUEST FOR PRODUCTION NO. 42:**

Provide a copy of all written communications by and between Defendant and his father, Keith Young, concerning the Property, the financing provided for construction of the Property, and the repayment of any loan provided by Keith Young to Defendant for the financing of the construction of the Property.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**Also see *Response* to RFP No. 1.**

**REQUEST FOR PRODUCTION NO. 43:**

Produce the complete City-approved (stamped) blueprints, plans, and specifications for the home you constructed for Plaintiff located at 448 San Clemente, El Paso, Texas 79912.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO. 44 (and Second Request for Production No. 1):**

Produce all of your written communications with High Mountain Limited and/or Richard Thomas.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO. 45 (and Second Request for Production No. 2):**

Produce all of your written communications with Vision Consultants and/or Kelly Sorrenson and/or Oscar Loya.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**REQUEST FOR PRODUCTION NO. 46 (and Second Request for Production No. 3):**

Produce all of your written communications with AD Electric and/or Luis Gomez.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**REQUEST FOR PRODUCTION NO. 47 (and Second Request for Production No. 4):**

Produce all of your written communications with Amador Martinez.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO. 48 (and Second Request for Production No. 5):**

Produce all of your written communications with Andres Diaz.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO. 49 (and Second Request for Production No. 6):**

Produce all of your written communications with Abel Vazquez.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**REQUEST FOR PRODUCTION NO. 50 (and Second Request for Production No. 7):**

Produce all of your written communications with the City of El Paso and/or Jim Nuzzo, Ron Roth, or Lany Nichols, employees of the City of El Paso.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**REQUEST FOR PRODUCTION NO. 51 (and Second Request for Production No. 8):**

Produce all of your written communications with Keith Young.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**Also see *Response* to RFP No. 1.**

**REQUEST FOR PRODUCTION NO. 52 (and Second Request for Production No. 9):**

Produce all of your written communications with Brock & Bustillos, Inc. or any of its employees.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**REQUEST FOR PRODUCTION NO. 53 (and Second Request for Production No. 10):**

Produce all of your written communications with Essential Fire Protection Systems, Inc. or any of its employees and/or Randy Huffman, the President of Essential Fire Protection Systems, Inc.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**REQUEST FOR PRODUCTION NO. 54 (and Second Request for Production No. 11):**

Produce all of your written communications with AC Refrigeration and/or Angel Cabrera.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO. 55:**

Produce all of your checking account statements for any accounts in which you were a signatory from January 1, 2013 through February 29, 2014 and all checks referenced in those bank statements.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO. 56:**

Produce all of your checking account statements for your business account for January 1, 2013 through February 29, 2014 and produce copies of all checks referenced in those bank statements.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO. 57:**

Produce a copy of all of your checking account statements for your personal account for January 1, 2013 through December 24, 2013 and produce all checks referenced in those personal bank account statements.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO. 57:**

Produce all documents obtained by you or your lawyer from third parties by means of the Subpoenas issued in the bankruptcy litigation pending between you and Pamela Young which were served on the following third parties:

1. Michelle's Ventures, Inc. d/b/a Vision Consultants;
2. Parker Engineering, LLC f/k/a Parker Engineering, Inc.;
3. Old Republic Surety Company;
4. Lawrence Shashy;
5. Conde, Inc.;
6. City of El Paso, Development Department;
7. Carlos Manuel Jimenez d/b/a CAD Consulting Co.;
8. Burman Construction, LLC;
9. Raymond W. Armendariz d/b/a Armendariz Inspection Service;
10. Willi Holst d/b/a Action Pool Service;
11. Cardinal Financial Company, L.P. d/b/a Sebonic Financial, L.P.; and,
12. Entitle Insurance Company.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO. 58:**

Produce all of your written communications with Old Republic Surety Company or any of its employees.

**RESPONSE: Please see attached for what is in my possession, custody, or control.**

Respectfully submitted,

**MIRANDA & MALDONADO, P.C.**

/s/ Carlos A. Miranda III, Esq.
Carlos A. Miranda III, Esq.
Carlos G. Maldonado, Esq.
5915 Silver Springs, Bldg. 7
El Paso, Texas 79912
(915) 587-5000 (Telephone)
(915) 587-5001 (Facsimile)
cmiranda@eptxlawyers.com
cmaldonado@eptxlawyers.com

Attorneys for Travis Young

# VERIFICATION

**STATE OF TEXAS**          )
                                        )

**EL PASO COUNTY**             )

       Before me, the undersigned notary, on this day personally appeared TRAVIS YOUNG, the Affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

"My name is TRAVIS YOUNG. I am capable of making this *Sworn Verification*. I have read the *Responses to First and Second Requests for Production*. The facts stated in it are within my personal knowledge and are true and correct."

 

 

                                       TRAVIS YOUNG

       Sworn to and subscribed before me by TRAVIS YOUNG on December 29, 2017.

WENDY AVALOS
Notary Public, State of Texas
Comm. Expires 01-18-2021
Notary ID 129271795

                                 Notary Public in and for
                                 the State of Texas

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 29th day of December 2017, I served a true and correct copy of the *Travis Young's Sworn Responses to First and Second Requests for Production* by Hand-Delivery and Electronic Service to the following Parties:

**Plaintiff**
Pamela W. Young
c/o Corey W. Haugland, Esq.
James & Haugland, P.C.
609 Montana Avenue
El Paso, TX 79902
(915) 532-3911 (Telephone)
**chaugland@jghpc.com**

**Chapter 7 Trustee**
Ronald E. Ingalls
P.O. Box 2867
Fredericksburg, TX 78624-1927

/s/ Carlos A. Miranda, Esq.
Carlos A. Miranda, Esq.
Carlos G. Maldonado, Esq.
Attorneys for Travis Young

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

IN RE:               )
                        )
**TRAVIS YOUNG,**       )
                        )
     **Debtor.**       )     **Bankruptcy Case No. 17-30163**
                        )
_____)
                        )
**PAMELA YOUNG,**     )
                        )
     **Plaintiff,**      )
                        )
**v.**                  )     **Adversary Case No. 17-03010**
                        )
**TRAVIS YOUNG,**       )
                        )
     **Defendant.**     )

## BRITTANY YOUNG'S SWORN RESPONSES TO THIRD PARTY REQUESTS FOR PRODUCTION

COMES NOW Brittany Young, Third-Party Respondent herein, through her attorneys of record MIRANDA & MALDONADO, P.C., and hereby submits the following *Sworn Responses to Third-Party Requests for Production* as follows:

### RESPONSES TO REQUESTS FOR DOCUMENTS

1.     All documents relating to savings bank books, records, accounts and memoranda, current as well as those that may have been canceled, whether in your name or your spouse's name, individually or jointly, or in connection with any other person or persons. This includes but is not limited to your checking and savings account at Wells Fargo Bank, JP Morgan Chase Bank, and First Light Credit Union.

**RESPONSE: See attached for what is in my possession, custody, or control.**

2.     All documents relating to all checking accounts, in your name individually or jointly with your spouse's name, or in the name of Premier Builders or Bay Homes or in connection with any other person or persons, including checkbooks, checkbook stubs, monthly statements, canceled checks and deposit slips, whether the accounts are current or may have been closed. This includes but is not limited to your checking and savings account at Wells Fargo Bank, JP Morgan Chase Bank, and First Light Credit Union.

**EXHIBIT**

P-5

tabbies®

**RESPONSE: See responsive documents attached to Request No. 1.**

**See attached for what is in my possession, custody, or control.**

3.      All documents relating to stock certificates, bonds, or other securities in your name or your spouse's name, individually or jointly, or in connection with any other person or persons, or which may be held in an account for you, individually, or in the name of Premier Builders or Bay Homes or in conjunction with any other person or persons in any corporation.

**RESPONSE: None.**

4.      All documents relating to stock brokerage accounts in your name or your spouse's name, individually or jointly, or in the name of Premier Builders or Bay Homes or in connection with any other person or persons, including but not limited to, books, records, accounts, monthly statements, statements of transactions and all other papers and memoranda thereof.

**RESPONSE: None.**

5.      All documents relating to federal and state income tax returns together with the Form W-2s, Form 1099's, schedules and worksheets thereof and all other papers, and memoranda referring to any adjustment made in connection therewith for the previous four (4) years (2013.2014, 2015, and 2016).

**RESPONSE: See attached for what is in my possession, custody, or control.**

6.      This *Request* has been quashed by *Order Modifying Subpoena* entered by Judge H. Christopher Mott dated October 26, 2017.

**RESPONSE: No response is necessary.**

7.      All documents relating to deeds or conveyances of real property in your name or your spouse's name, individually or jointly, or in connection with any other person or persons, or of which you or your spouse, individually or jointly, are the legal beneficiary or equitable owner or have any interest therein.

**RESPONSE: See attached for what is in my possession, custody, or control.**

8.      All documents relating to monies received and being presently received by you or your spouse from all sources, including but not limited to salaries, wages, earnings, drawings, dividends, bonuses, sick pay, pension or retirement funds, loans, family assistance, gifts, monetary gifts, or reimbursed expenses, for the preceding four (4) years since January 1, 2013.

**RESPONSE: See attached for what is in my possession, custody, or control.**

9.      This *Request* has been quashed by *Order Modifying Subpoena* entered by Judge H. Christopher Mott dated October 26, 2017.

**RESPONSE: No response is necessary.**

10.     This *Request* has been quashed by *Order Modifying Subpoena* entered by Judge H. Christopher Mott dated October 26, 2017.

**RESPONSE: No response is necessary.**

11.     All documents including but not limited to, books, records, general ledgers, general journals, cash journals, payroll records, purchase and sales journals, petty cash records, bank statements, and canceled checks relating to any business engaged in or owned by you or your spouse, individually or jointly, including but not limited to Premier Builders or Bay Homes, or in conjunction or partnership with any other individual or individuals and/or records for any corporation which you or your spouse, individually or jointly, hold stock directly or indirectly if the corporation records are under the actual or constructive control of you or your spouse, individually or jointly.

**RESPONSE: See attached for what is in my possession, custody, or control.**

12.     All documents relating to the title of any assets held by you or your spouse, individually or jointly, or by any companies owned by you or your spouse, whether presently owned by you or your spouse, individually or jointly, or by companies owned by you or your spouse, or previously transferred within the preceding four (4) years.

**RESPONSE: See attached for what is in my possession, custody, or control.**

13.     All documents relating to bills and/or purchase price for items which you claim to be Premier Builders' or Bay Homes' business or your personal, community, or separate property and records concerning acquisition of same, including but not limited to trucks, trailers, tools, jewelry, purses, shoes, designer clothing, watches, or any item of personally having a price in excess of $500.00.

**RESPONSE: See attached for what is in my possession, custody, or control.**

**Brittany Young has no interest in Premier Builders or Bay Homes.**

14.     All documents relating to bills and/or purchase price for items which you claim to be your separate property and records concerning the acquisition of same.

**RESPONSE: See attached for what is in my possession, custody, or control.**

15.     This *Request* has been quashed by *Order Modifying Subpoena* entered by Judge H. Christopher Molt dated October 26, 2017.

**RESPONSE: No response is necessary.**

16. This *Request* has been quashed *by Order Modifying Subpoena* entered by Judge H. Christopher Mott dated October 26, 2017.

**RESPONSE: No response is necessary.**

17. All documents relating to financial statements together with the schedules and worksheets thereof and all other papers, and memoranda for financial statements or loan applications prepared or submitted to any individual or institution or lender (including but not limited to Keith Young, Kathleen Hernandez, Bank of America, JP Morgan Chase Bank, Capital One, Jet Private Lending, Security, LLC, Binary Investments, Inc., and Citi Cards) for the preceding four (4) years.

**RESPONSE: See attached for what is in my possession, custody, or control.**

18. All documents relating to debts which are owed to you or your spouse, individually or jointly, including but not limited to, promissory notes, IOU notes and/or accounts receivable.

**RESPONSE: None.**

19. All monthly credit card statements, including but not limited to the monthly statements for Barclay Card U.S., American Express, Bank of America, JP Morgan Chase Bank and Citi Cards.

**RESPONSE: See attached for what is in my possession, custody, or control.**

20. All contracts or agreements or documents memorializing the business relationship between Brittany Young, individually and d/b/a Premier Builders or d/b/a Bay Homes and its customers including but not limited to Daniel L. Fink, R. W. Schwartz, Jesus Reza Gutierrez, Rebeca Wisbrun, Jose L. Macias-Flores, and Keith Young. This request for documentation includes written agreements, quotes, and or written acceptances by the customer confirming the existence of a relationship between Brittany Young, individually and d/b/a Premier Builders and the customer.

**RESPONSE: Respondent Brittany Young has not ever had a business relationship with these entities or individuals.**

21. Any checking account statements for you, your husband, or joint statements for you and your husband, including a check register for Premier Builders or Bay Homes.

**RESPONSE: See Response to Request No. 1 for Partial Response. Additionally, Bay Homes did not have its own bank account. Brittany Young has not ever had an ownership interest in or access to "Premier Builders" bank accounts.**

**See attached for what is in my possession, custody, or control.**

22. Your Texas driver's license and social security card.

**RESPONSE: See attached for what is in my possession, custody, or control.**

23. Your homeowner's or renter's insurance policy including all riders.

**RESPONSE: None.**

24. All documents including but not limited to, books, records, general ledgers, general journals, cash journals, payroll records, purchase and sales journals, petty cash records, bank statements, and canceled checks relating to any business engaged in or owned by Premier Builders & Design, LLC (or Premier Builders LLC).

**RESPONSE: See attached for what is in my possession, custody, or control.**

25. All documents relating to financial statements, including any financial statements ever prepared for Premier Builders & Design, LLC (or Premier Builders LLC), together with the schedules and worksheets thereof and all other papers, and memoranda for financial statements or loan applications prepared or submitted to any individual or institution or lender (including but not limited to Kathleen Hernandez, Bank of America, JP Morgan Chase Bank, Capital One, Jet Private Lending, Security. LLC, Keith Young and Citi Cards) for the preceding four (4) years.

**RESPONSE: None.**

26. All contracts or agreements or documents memorializing the business relationship between Premier Builders & Design, LLC (or Premier Builders LLC) and its customers. This request for documentation includes written agreements, quotes, and or written acceptances by the customer confirming the existence of a relationship between RUF Developers, LLC and the customer.

**RESPONSE: None.**

27. The general ledger for Premier Builders & Design, LLC (or Premier Builders LLC).

**RESPONSE: None.**

28. The accounts receivable ledger for Premier Builders & Design, LLC (or Premier Builders LLC).

**RESPONSE: None.**

29. Any checking account statements for Premier Builders & Design, LLC (or Premier Builders LLC), including a check register for Premier Builders & Design, LLC (or Premier Builders LLC).

**RESPONSE: Please see attached for what is my possession, custody, or control.**

**Also see *Response* to RFP No. 24.**

30.   All Form 940's and Form 941's filed for the Premier Builders & Design, LLC (or Premier Builders LLC) business since January 1, 2014.

**RESPONSE: None.**

31.   An inventory of vehicles, tools and equipment utilized by Premier Builders & Design, LLC (or Premier Builders LLC) in its business.

**RESPONSE:**

**2008 Ford F-250,**

**2012 Audi Q5**

**2013 Infiniti G37.**

**No other equipment.**

**Work performed by subcontractors.**

32.   A copy of any renditions submitted for Premier Builders & Design, LLC's (or Premier Builders LLC's) business assets to the El Paso Central Appraisal District.

**RESPONSE: None.**

33.   All documents relating to bills and/or purchase price for items which you claim to be Premier Builders & Design, LLC's (or Premier Builders LLC's) business property and records concerning acquisition of same, including but not limited to trucks, trailers, tools, jewelry, purses, shoes, designer clothing, watches, or any item of personal property having a price in excess of $500.00.

**RESPONSE: See attached for what is my possession, custody or control.**

**Also see *Response* to RFP No. 2.**

34.   All documents including but not limited to, books, records, general ledgers, general journals, cash journals, payroll records, purchase and sales journals, petty cash records, bank statements, and canceled checks relating to any business engaged in or owned by Premier Builders & Design, LLC (or Premier Builders LLC).

**RESPONSE:  Please see attached for what is my possession, custody, or control.**

**Also see Response to RFP No. 24.**

35.   All documents relating to financial statements, including any financial statements ever prepared for RUF Developers, LLC (or RUF LLC), together with the schedules and

worksheets thereof and all other papers, and memoranda for financial statements or loan applications prepared or submitted to any individual or institution or lender (including but not limited to Kathleen Hernandez, Bank of America. JP Morgan Chase Bank, Capital One, Jet Private Lending, Security, LLC, Keith Young and Citi Cards) for the preceding four (4) years.

**RESPONSE: Please see attached for what is my possession, custody, or control.**

**Also see Response to RFP No. 24.**

36.     All contracts or agreements or documents memorializing the business relationship between RUF Developers, LLC (or RUF LLC) and its customers. This request for documentation includes written agreements, quotes, and or written acceptances by the customer confirming the existence of a relationship between RUF Developers, LLC and the customer.

**RESPONSE: None.**

37.     The general ledger for RUF Developers, LLC (or RUF LLC).

**RESPONSE: None.**

38.     The accounts receivable ledger for RUF Developers, LLC (or RUF LLC).

**RESPONSE: None.**

39.     Any checking account statements for RUF Developers, LLC (or RUF LLC), including a check register for RUF Developers, LLC (or RUF LLC).

**RESPONSE: None.**

40.     All Form 940s and Form 941 s filed for the RUF Developers, LLC (or RUF LLC) business since January 1, 2014.

**RESPONSE: None.**

41.     An inventory of vehicles, tools and equipment utilized by RUF Developers, LLC (or RUF LLC) in its business. If acquired since January 1, 2016, produce the purchase order, bill of sale, credit card receipt or any other documents memorializing the purchase.
**RESPONSE:**

**2008 Ford F-250,**

**2012 Audi Q5**

**2013 Infiniti G37**

42.    A copy of any renditions submitted for RUF Developers, LL C's ( or RUF LLC's) business assets to the El Paso Central Appraisal District.

**RESPONSE: None.**

43.    All documents relating to bills and/or purchase price for items which you claim to be RUF Developers, LLC's (or RUF LLC's) business property and records concerning acquisition of same, including but not limited to trucks, trailers, tools, jewelry, purses, shoes, designer clothing, watches, or any item of personal property having a price in excess of $500.00.

**RESPONSE: See attached for what is my possession, custody or control.**

**Checks for two (2) Lots.**

44.    An itemized list of items purchased to build or renovate 724 Montoya Oak Lane and its swimming pool, 356 Silver Star, the Las Cruces home (Country Club Estates#3, PLT#4, Lot 5, Block 112) and 354 Rocky Pointe.

**RESPONSE: See attached for what is my possession, custody, or control.**

45.    Provide a copy of the Retail Installment Contracts and any related financing documents associated with the purchase of your automobiles and trucks or the purchase of any vehicles in the name of one of your businesses.

**RESPONSE: None.**

46.    This *Request* has been quashed by *Order Modifying Subpoena* entered by Judge H. Christopher Mott dated October 26, 2017.

**RESPONSE: No response is necessary.**

47.    Documents relating to any loans provided to Travis Young, Brittany Young, Premier Builders, Premier Builders & Design, LLC, Bay Homes, Premier Builders, LLC, RUF Developers, LLC, or RUF LLC for the purchase of lots and construction materials. Provide any documents which prove that any of the loans at issue have been paid back to the lender (or not).

**RESPONSE: Please see what is my possession, custody, or control.**

48.    This *Request* has been quashed by *Order Modifying Subpoena* entered by Judge H. Christopher Mott dated October 26, 2017.

**RESPONSE: No response is necessary.**

49.    Your job file for all properties constructed by you or any company owned by you since January 1, 2016. That includes all invoices related to the construction. That includes all

subcontracts related to the construction. That includes all closing documents, including the HUD-1 from the closing on the sale of any properties by you or any company owned by you.

**RESPONSE: RUF LLC – None.**

50.    All documents relating to federal and state income tax returns specifically including the Form W-2s, Form 1 099s, schedules and worksheets thereof and all other papers, and memoranda referring *to* any adjustment made in connection therewith for the previous four (4) years (2013, 2014, 2015, and 2016). This also includes the invoices and bills which support the business expenses claimed in your tax returns.

**RESPONSE:  Please see what is my possession, custody, or control.**

**See also *Response* to RFP No. 5.**

51.    All documents relating to monies received and being presently received by you from any family member or any third party, including but not limited to salaries, wages, earnings, draws, loans, family assistance, gifts, monetary gifts, or reimbursed expenses since January 1, 2013.

**RESPONSE:  Please see what is my possession, custody, or control.**

**See also *Response* to RFP No. 8.**

52.    All documents relating any agreement with your husband, Travis Young, concerning marital property, separate property or the division of your income or assets during your marriage.

**RESPONSE: None.**

53.    Your homeowner's insurance policy including all riders for the years 2015 and 2016.

**RESPONSE: None.**

54.    All credit card bills and related documents since January 1, 2016.

**RESPONSE: Please see what is my possession, custody, or control.**

**See also *Response* to RFP No. 19.**

55.    All retail installment contracts, purchase orders, contracts and/or certificates of title related to any automobile, truck, or construction equipment purchases by you or any company owned by you since January 1, 2015.

**RESPONSE: Please see what is my possession, custody, or control.**

56. This *Request* has been quashed by *Order Modifying Subpoena* entered by Judge H. Christopher Mott dated October 26, 20 1 7.

**RESPONSE: No response is necessary.**

57. Produce documents reflecting any payments made on these student loans since January 1, 2014.

**RESPONSE: See attached for what is in my possession, custody, or control.**

58. This *Request* has been quashed by *Order Modifying Subpoena* entered by Judge H. Christopher Moll dated October 26, 2017.

**RESPONSE: No response is necessary.**

59. This *Request* has been quashed by *Order Modifying Subpoena* entered by Judge H. Christopher Mott dated October 26, 2017.

**RESPONSE: No response is necessary.**

60. Produce all documents memorializing any compensation paid to Travis Young for work he has performed for you or any of your business entities.

**RESPONSE: None.**

61. Produce all documents related to your acquisition of the real property located at *354 Rocky Pointe*, including the *deed*, any *deed of trust*, any *promissory note*, and any *contract* for the purchase of said real property.

**RESPONSE: See attached for what is in my possession, custody, or control.**

62. The *job file* for any construction that you or one of your companies has performed on the real property located at *354 Rocky Pointe*, including subcontracts, invoices for purchases of materials, interim construction financing documents, City of El Paso permits, and job inspection reports.

**RESPONSE: See attached for what is in my possession, custody, or control.**

63. Produce the *promissory note, security agreement, deed of trust, application for loan*, and any communications related to your acquisition of a *loan* for *$225,000.00* from *EPT Gray Properties*.

**RESPONSE: None.**

64. This *Request* has been quashed by *Order Modifying Subpoena* entered by Judge H. Christopher Mott dated October 26, 2017.

**RESPONSE: No response is necessary.**

65.     Produce all documents related to your acquisition of the real property located at *350 Rocky Pointe*, including the deed, any deed of trust, any promissory note, and any contract for the purchase of said real property.

**RESPONSE: See attached for what is in my possession, custody, or control.**

66.     The *job file* for any construction that you or one of your companies has performed on the real property located at *350 Rocky Pointe*, including subcontracts, invoices for purchases of materials, interim construction financing documents, City of El Paso permits, and job inspection reports.

**RESPONSE: None.**

67.     Produce all documents related to your acquisition of the real property located at *383 Rocky Pointe*, including the deed, any *deed of trust*, any *promissory note*, and any contract for the purchase of said real property.

**RESPONSE: None.**

68.     The *job file* for any construction that you or one of your companies has performed on the real property located at *383 Rocky Pointe*, including subcontracts, invoices for purchases of materials, interim construction financing documents, City of El Paso permits, and job inspection reports.

**RESPONSE: None.**

69.     Produce all documents related to your acquisition of the real property located at 4049 Tierra Santa Place, including the deed, any deed of trust, any promissory note, and any contract for the purchase of said real property.

**RESPONSE: None.**

70.     The job file for any construction that you or one of your companies has performed on the real property located at 4049 Tierra Santa Place, including subcontracts, invoices for purchases of materials, interim construction financing documents, City of El Paso permits, and job inspection reports.

**RESPONSE: None.**

71.     Produce all documents related to your acquisition of the real property located at 6301 Franklin Bluff, including the deed, any deed of trust, any promissory note, and any contract for the purchase of said real property

**RESPONSE: None.**

72.     The job file for any construction that you or one of your companies has performed on the real property located at 6301 Franklin Bluff including subcontracts, invoices for purchases of materials, interim construction financing documents, City of El Paso permits, and job inspection reports.

**RESPONSE: None.**

73.     Produce the promissory note, security agreement, deed of trust, application for loan, and any communications related to your obtaining any loans from High Limited Company.

**RESPONSE: See attached for what is in my possession, custody, or control.**

Respectfully submitted,

**MIRANDA & MALDONADO, P.C.**

/s/ Carlos A. Miranda III, Esq.
Carlos A. Miranda III, Esq.
Carlos G. Maldonado, Esq.
5915 Silver Springs, Bldg. 7
El Paso, Texas 79912
(915) 587-5000 (Telephone)
(915) 587-5001 (Facsimile)
cmiranda@eptxlawyers.com
cmaldonado@eptxlawyers.com

Attorneys for Brittany Young

# VERIFICATION

STATE OF TEXAS            )
                                        )

EL PASO COUNTY           )

Before me, the undersigned notary, on this day personally appeared BRITTANY YOUNG, the Affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

"My name is BRITTANY YOUNG. I am capable of making this *Sworn Verification*. I have read the *Responses to Third-Party Requests for Production*. The facts stated in it are within my personal knowledge and are true and correct."

BRITTANY YOUNG

Sworn to and subscribed before me by BRITTANY YOUNG on December 29, 2017.

WENDY AVALOS
Notary Public, State of Texas
Comm. Expires 01-18-2021
Notary ID 129271795

Notary Public in and for
the State of Texas

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 29th day of December 2017, I served a true and correct copy of the *Respondent's Sworn Responses to Third-Party Requests for Production* by Hand-Delivery and Electronic Service to the following Parties:

**Plaintiff**
Pamela W Young
c/o Corey W. Haugland, Esq.
James & Haugland, P.C.
609 Montana Avenue
El Paso, TX 79902
(915) 532-3911 (Telephone)
**chaugland@jghpc.com**

**Chapter 7 Trustee**
Ronald E. Ingalls
PO Box 2867
Fredericksburg, TX 78624-1927

/s/ Carlos A. Miranda, Esq.
Carlos A. Miranda, Esq.
Carlos G. Maldonado, Esq.
Attorneys for Brittany Young

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| TRAVIS RYAN YOUNG, | § | Case No. 17-30163-hcm |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

## **ORDER GRANTING PAMELA YOUNG'S THIRD MOTION TO COMPEL AND FOR SANCTIONS AGAINST DEBTOR TRAVIS RYAN YOUNG**

Came on to be considered Pamela Young's Third Motion to Compel and for Sanctions Against Debtor Travis Ryan Young (hereinafter the "Motion"). The Court, after reviewing the Motion and the response filed, if any, as well as the evidence and arguments of counsel finds the following:

A.      There is clear and convincing evidence that 1) there was an order of this Court order in effect, 2) the order required specific conduct by the Debtor, Travis Ryan Young, and 3) Travis Ryan Young failed to comply with the Court's Order.

Client Files\0012806\00101\00511866.WPD



EXHIBIT
P-6

B.   Travis Ryan Young's non-compliance with the orders of this Court is willful.

C.   The Court has considered lesser sanctions and no less drastic sanctions will suffice.

D.   Debtor has failed to comply with the Agreed Order for almost six months and has completely ignored the Court's December 12, 2017 Order.

E.   No other remedy is adequate and therefore this sanction is appropriate.

It is therefore,

**ORDERED, ADJUDGED and DECREED** that Pamela Young's Third Motion to Compel and for Sanctions Against Debtor Travis Ryan Young is GRANTED.  It is further,

**ORDERED, ADJUDGED and DECREED** that:

_____   Travis Ryan Young is not entitled to a discharge under 11 U.S.C. §727(a)(6).

_____   Travis Ryan Young is directed to produce the sworn response set forth in the Court's Order entered on December 12, 2017 and the documents set forth in the Agreed Order Resolving Motion to Compel and for Sanctions Pursuant to Rule 2004 entered on June 15, 2017 [Doc # 32] within 14 days of the entry of the order and the failure to do so will result in the entry of an order denying discharge under 11 U.S.C. §727(a)(6).

It is further,

**ORDERED, ADJUDGED and DECREED** that Travis Ryan Young, pay Pamela Young the amount of $2,500.00 as reasonable and necessary attorney's fees incurred in bringing forth the Motion and for attending hearing on same **within 14 days of the date of this Order**.  Plaintiff shall have all writs and process necessary to collect this fee award.

### ###

Submitted by:
Corey W. Haugland
State Bar No. 09234200
JAMES & HAUGLAND, P.C.
609 Montana Avenue
El Paso, Texas 79902
Phone: 915-532-3911
FAX: (915) 541-6440